James GUEVARA, Appellant,

v.

The STATE of Texas, Appellee.

No. 04–00–00340–CR.

Court of Appeals of Texas,
San Antonio.

Jan. 31, 2003.

Discretionary Review Granted
June 18, 2003.

Nancy B. Barohn, San Antonio, for Appellant.

Michael P. Miklas, III, Asst. Crim. Dist. Atty., San Antonio, for State.

Sitting: ALMA L. LÓPEZ, Chief Justice, CATHERINE STONE, Justice, PAUL W. GREEN, Justice, SARAH B. DUNCAN, Justice, KAREN ANGELINI, Justice, SANDEE BRYAN MARION, Justice, PHIL HARDBERGER, Chief Justice (retired).[1]

## OPINION ON APPELLANT'S MOTION FOR REHEARING EN BANC

Opinion by KAREN ANGELINI, Justice.

A jury found James Guevara guilty as a party to the murder of his wife, Velia Guevara, and sentenced him to life in prison and a $10,000 fine. Velia died on May 26, 1993 of multiple gun shot wounds. The murder weapon was never found. Guevara raises several issues on appeal, complaining of the sufficiency of the evidence, error in the jury charge, prosecutorial misconduct, and ineffective assistance of counsel. In an opinion and judgment dated December 26, 2001, we affirmed the trial court's judgment. Guevara filed motions for rehearing and for reconsideration by the en banc court. We grant the motions for rehearing and for reconsideration by the en banc court, withdraw our opinion and judgment of December 26, 2001, and issue this opinion and judgment in its place. We reverse and remand for a new trial.

## SUFFICIENCY OF THE EVIDENCE

Issues one and two challenge the legal and factual sufficiency of the evidence that supports Guevara's guilt as a principal[2] and a party. The charge informed the

---

1. Retired Chief Justice Hardberger not participating.

2. The evidence is uncontroverted that Guevara was not present at the time of the shooting because he was at the golf course.

jury that: "A person is criminally responsible for an offense committed by the conduct of another if acting with intent to promote or assist the commission of the offense, he solicits, encourages, directs, aids, or attempts to aid the other person to commit the offense; or having a legal duty to prevent commission of the offense and acting with intent to promote or assist its commission, he fails to make a reasonable effort to prevent commission of the offense." Guevara asserts he had no legal duty to prevent his wife's murder; and, to the extent the State did not rely on the legal duty theory, its case depended upon an impermissible stacking of inferences.

### A. Standard of review

■ We review the sufficiency of the evidence under the traditional standards of review. See *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979) (legal sufficiency); *Dewberry v. State*, 4 S.W.3d 735, 740 (Tex.Crim.App. 1999) (same); *Cain v. State*, 958 S.W.2d 404, 407 (Tex.Crim.App.1997) (factual sufficiency); *Clewis v. State*, 922 S.W.2d 126, 129 (Tex.Crim.App.1996) (same). The standard of review is the same in both direct and circumstantial evidence cases. *Kutzner v. State*, 994 S.W.2d 180, 184 (Tex. Crim.App.1999).

### B. Conviction based on aiding theory

■ A person is criminally responsible as a party to an offense if the offense is committed by his own conduct, by the conduct of another for which he is criminally responsible, or by both. TEX. PEN. CODE ANN. § 7.01(a) (Vernon 1994). A person is criminally responsible for the conduct of another if he intentionally aids or assists the other person in committing the murder. *Id.* § 7.02(a)(2).

The evidence shows that, at the time of the offense, Guevara was involved in a long-standing affair with Minnie Salinas.[3] Salinas had told Guevara they would have to go their separate ways if something did not happen by June.[4] About a month before the murder, Guevara and Salinas were at a shooting range, where they both shot a rented nine millimeter gun. The range had only one nine millimeter gun available to rent. Guevara said he purchased a box of ammunition, and he picked up some of the spent cartridge casings at the shooting range and put them into the box. On the day of the murder, Guevara left the house at about 6:30 a.m. to meet Paul Knauss, and another friend who never showed up, for a round of golf. Knauss recalled a conversation he had with Guevara a couple of months before the shooting, at which time Guevara said he had been researching information about making a silencer.

At about 8:00 a.m., on May 26th, Kathleen Cadena, property manager at the Guevara's apartment complex, arrived at work. Sometime before 9:00 a.m., she received a call from the answering service, which reported several calls concerning a car belonging to the tenant in Apartment 424, which was the Guevara's apartment, with its lights on. At 9:00 a.m., Cadena received another similar call, and Shelley Selzor, the leasing agent, took another call about fifteen minutes later. Cadena told Selzor to contact Velia.

Cadena said a woman came by the office at about 8:45 a.m. The office was not yet open, so the woman returned between 9:15 and 9:30 a.m., asking to use the phone. Cadena offered the office phone, but the

---

3. Guevara did not testify; his statement taken by the police, was read to the jury at trial.

4. Salinas did not testify; this information comes from Guevara's statement to the police.

woman asked for a pay phone. Cadena directed the woman to the pay phone at the back of the club house. The woman was gone for a short time, then came back through the leasing office without stopping. George Garza, the maintenance man, also recalled seeing the woman. Cadena and Garza later identified the woman as Salinas. At about 10:00 a.m., Velia came to the leasing office to say her car lights were not on.

Guevara played golf until about 1:00 or 2:00 p.m., then he spent the next three hours at the *San Antonio Light* career services office pursuing prospective employment opportunities. At about 4:00 p.m., he returned to his apartment, where he found his wife inside the apartment, lying dead on the hallway floor. There was no sign of forced entry. Velia had three gunshot wounds to the abdomen. One bullet was recovered from her body, one bullet was found on the floor of the office[5] near the computer, and one bullet was found behind a door by the entryway. A cartridge casing was recovered from the couch in the office. A police officer testified that a logical deduction would be that this casing had been ejected from the murder weapon. A full box of fifty, spent nine millimeter cartridge casings, of various brands, was found in the office closet under a pile of clothes. Inside Guevara's car, officers found a pawn shop receipt for a nine millimeter gun, and three spent cartridge casings in the front console. Guevara had put a nine millimeter gun on layaway at the pawn shop, but he never picked it up. At the crime scene, Guevara did not appear emotional or upset.

The Chief Medical Examiner estimated that Velia died four to six hours before her body was discovered at 4:00 p.m. (anytime between 10:00 a.m. and noon).

Richard Stengel, the State's firearm and toolmark expert, examined the bullet taken from Velia's body and the two bullets from the apartment, and concluded all three bullets were nine millimeters and had been fired from the same gun. Stengel examined the fifty casings from the box recovered from Guevara's apartment and the four loose casings recovered from the apartment and car. Stengel concluded all fifty-four casings were nine millimeters and had been fired from four different nine millimeter guns. Stengel's most incriminating testimony was that the casing from the apartment couch, two casings from Guevara's car, and thirty of the casings in the box of fifty were all fired from the same gun. The third casing from the car and ten of the casings from the box of fifty were fired from the same gun.

Stengel also compared a nine millimeter casing that a detective shot from the shooting range's rental nine millimeter gun to the bullets and casings from the crime scene and car. Stengel later requested the actual gun, and received a Smith and Wesson nine millimeter from the shooting range. He determined that the rented gun did not fire any of the casings found in the car, at the crime scene, or from the box of fifty.

Tina Marie Lopez, a friend of Salinas, testified that during a late-night conversation the day of the murder, Salinas asked Lopez to meet her at a restaurant so that Salinas could give Lopez Salinas's twenty-two caliber gun. Lopez refused to meet Salinas.[6]

---

**5.** The Guevaras had a two-bedroom apartment, one of which was used as an office.

**6.** On appeal, the State refers to other portions of Lopez's testimony, none of which was be-

fore the jury—all the testimony cited by the State in its brief and at oral argument took place outside the jury's presence. Therefore, contrary to the State's argument on appeal, there is no direct evidence that Guevara

To convict Guevara as a party, the evidence had to show that, at the time of the offense, the parties were acting together, each contributing some part towards the execution of their common purpose. *Pesina v. State*, 949 S.W.2d 374, 382–83 (Tex.App.-San Antonio 1997, no pet.). This may be done with either direct or circumstantial evidence. *Pesina*, 949 S.W.2d at 383. In determining whether a defendant participated in an offense as a party, the court may examine the events *occurring before, during, and after* the commission of the offense and may rely on actions of the defendant that show an understanding and common design to commit the offense. *Ransom v. State*, 920 S.W.2d 288, 302 (Tex.Crim.App.1994). The accused must know that he is assisting in the commission of the offense. *Pesina*, 949 S.W.2d at 382. Intent may be inferred from circumstantial evidence such as the acts, words, and conduct of the accused. *Patrick v. State*, 906 S.W.2d 481, 487 (Tex.Crim.App.1995). In determining the sufficiency of the evidence to show an appellant's intent, and faced with a record that supports conflicting inferences, we must presume—even if it does not affirmatively appear in the record—that the trier of fact resolved any such conflict in favor of the prosecution, and we must defer to that resolution. *Matson v. State*, 819 S.W.2d 839, 846 (Tex.Crim.App.1991).

In this case, Guevara's intent to assist with the murder of his wife may be inferred from the evidence. He was involved in a long-standing affair with Salinas; he and Salinas shot a nine millimeter gun at a shooting range about one month before the murder; the bullets at the crime scene were nine millimeters and had been fired from the same gun; the casing from the apartment couch, two casings from Guevara's car, and thirty of the cas-

ings in the box of fifty were all fired from the same gun; none of the bullets or casings retrieved from the crime scene or Guevara's car had been fired from the rented gun; Guevara played golf at the time of the murder; he told Knauss he was researching making a silencer; and he did not appear upset at the crime scene.

Guevara's two statements to the police were admitted during the State's case-in-chief. In Guevara's first statement, he admitted to owning only a shotgun and a twenty-two caliber revolver, and having a nine millimeter gun on layaway at a pawn shop. He further admitted to shooting a nine millimeter gun at the gun range, buying a box of bullets, picking up empty casings at the range, and having some of those casings in his car. However, the next day he made another statement to the police. The second statement began with the admission that he "was not being totally honest" in the first statement. After admitting to a long affair with Salinas, he described his trip with her to the gun range. He also said he rented a nine millimeter and bought a box of ammunition while at the gun range.

The jury was left to compare these statements with Stengel's examination, which revealed that only one of the three casings found in the car and ten in the box were fired from the same gun, but none were fired from the rented nine millimeter gun. Yet, the casing from the couch, two from the car, and thirty from the box were all fired from the same gun. A pawn shop receipt for a nine millimeter gun was found in Guevara's car. It is not illogical for a jury to conclude that it was a now unaccounted-for gun that was used to kill Velia. The only explanation for the casing found on the couch matching those in his car that is consistent with Guevara's inno-

owned a nine millimeter gun or that if he did own one, he gave it to Salinas.

cence is that Guevara—having so many casings—placed some of the casings neatly in the box, dropped two in the car, and then coincidently dropped one in the less obvious spot in a pile of laundry on the couch where a casing ejected from the killer's gun might have landed, although the killer efficiently retrieved all the casings actually fired. Yet, Guevara was unable to collect even a single casing from the rented gun he fired at the shooting range. We find, that based on this evidence, a jury could have reasonably concluded that someone who plans crimes with guns is invincibly ignorant of the science of firearms and toolmark experts.

Although the evidence supporting Guevara's conviction is circumstantial, it is both legally and factually sufficient to support the verdict. Because we conclude the evidence was sufficient to support the verdict under the aiding theory, we do not address whether the evidence supports the conviction under the legal duty theory.

### JURY CHARGE

In his third issue, Guevara asserts that the jury's charge, which allowed it to find him guilty under the theory of legal duty, was a misstatement of the law. The definitional paragraph of the charge informed the jury that

> A person is criminally responsible for an offense committed by the conduct of another if acting with intent to promote or assist the commission of the offense, he solicits, encourages, directs, aids, or attempts to aid the other person to commit the offense; *or having a legal duty to prevent commission of the offense and acting with intent to promote or assist its commission, he fails to make a reasonable effort to prevent commission of the offense.*

(Emphasis added.) The charge did not define "legal duty" for the jury. The application paragraph instructed the jury that if it found Guevara had acted "alone or together with another party" in committing the offense of murder, then it must find him guilty.

The State admits that the definitional paragraph indicated that Guevara could have been a party to his wife's murder if he had abrogated his legal duty to her with the intent to further the commission of the murder. Thus, the State concedes the jury charge might have contained an error if Guevara did not have a legal duty to protect his wife from Salinas. *See Medrano v. State*, 612 S.W.2d 576, 578 (Tex.Crim. App.1981) (without a legal duty arising to prevent the commission of an offense, there is no criminal conduct). On original submission, we held that the charge error was harmless because the jury could have found Guevara guilty under the aiding theory and not the duty theory, and the evidence was sufficient to support a conviction under the aiding theory.

However, in light of this court's recent opinion in *Bagheri v. State*, 87 S.W.3d 657 (Tex.App.-San Antonio 2002, pet. granted), we now reconsider our conclusion. In *Bagheri*, a driving while intoxicated case, the jury was instructed that the law deems a person to be intoxicated while driving if: (1) he does not have the normal use of his mental or physical faculties by reason of introduction of alcohol into the body; or (2) he has an alcohol concentration of 0.10 percent or more. The jury found defendant guilty, and on appeal, defendant argued that the trial court erred in admitting testimony regarding a retrograde extrapolation of the intoxilyzer test result. The State conceded error, but argued the error was harmless because the evidence was sufficient to support the conviction under the alternate impairment theory. This court, sitting en banc, considered the harm issue. *Id.* at 659.

We first determined that because the jury charge submitted both theories in a single question, we could not know which theory persuaded the jury beyond a reasonable doubt; thus, the State's argument on appeal was irrelevant. *Id.* at 660. Because the evidence supporting the impairment theory did not alone establish that the error in admitting the flawed retrograde extrapolation theory was harmless, we considered the harm issue under Texas Rule of Appellate Procedure 44.2(b) and the test set forth by the Court of Criminal Appeals in *Solomon v. State,* 49 S.W.3d 356, 365 (Tex.Crim.App.2001). *Id.*

Rule 44.2(b) provides that a nonconstitutional error must be disregarded unless it affects a defendant's "substantial rights." TEX.R.APP. P. 44.2(b). The *Solomon* court held that "substantial rights are not affected by the erroneous admission of evidence 'if the appellate court, after examining the record as a whole, has fair assurance that the error did not influence the jury, or had but slight effect.'" After reviewing the record in *Bagheri,* we concluded that the sufficiency of the evidence in support of the impairment theory was not relevant because "it in no way leads us to a 'fair assurance that the error (in admitting the retrograde extrapolation evidence) did not influence the jury, or had but a slight effect.'" 87 S.W.3d at 660. We noted that the State placed the retrograde extrapolation evidence before the jury by an expert witness that the State "touted" as having studied with leading experts in the field, and the evidence was not cumulative of other evidence. *Id.* Accordingly, we held the error was not harmless, reversed the trial court's judgment, and remanded for a new trial. *Id.*

In this case, we apply a similar analysis. The jury charge submitted the aiding theo-

ry and the legal duty theory in a single question. During arguments before the venire panel, the State twice used the example of a bodyguard stepping away and allowing his charge to be harmed as an example of how one could be a party to a crime. The State again used the example of a bodyguard during closing arguments. The prosecutor highlighted defendant's extramarital affair with Salinas, and argued that "perhaps the most horrible thing [the defendant] did was arrange to be away at the time of the murder, taking one little bit of protection away, because we know [Salinas] would never go into an apartment and kill [Velia] with him actually there." We cannot know which theory persuaded the jury beyond a reasonable doubt, and after a review of the record, we cannot conclude with "fair assurance" that the error did not influence the jury or had but slight effect.

## CONSTITUTIONAL COMPLAINT

■ In his fourth issue, Guevara argues that, to the extent he was convicted of murder as either a principal or a party on less than all the essential elements required by law, the conviction was unconstitutionally obtained. Guevara also argues that an application of the so-called *Malik* rule[7] to decrease the State's burden of proof on essential elements of the crime is unconstitutional. Except for these conclusory remarks, Guevara's brief on appeal does not elaborate on this argument; therefore, this complaint is waived. TEX. R.APP. P. 38.1(h).

## PROSECUTORIAL MISCONDUCT

### A. *Guevara's former attorney as a State's witness*

■ Guevara's fifth issue complains about the State calling Jesse Gamez, the

---

7. In *Malik v. State,* 953 S.W.2d 234, 240 (Tex. Crim.App.1997), the court held that the sufficiency of the evidence is measured against the offense defined by a hypothetically correct jury charge.

attorney who represented him initially in this criminal matter and in the civil matter associated with his wife's insurance policy, as a witness at his murder trial. Gamez, however, was not Guevara's counsel at the murder trial. Specifically, Guevara contends that the State impugned Gamez's integrity and suggested he tried to obstruct justice. A review of the complained-of testimony reveals the prosecutor and Gamez tangled over Gamez's reluctance to produce a copy of the civil deposition to the State (apparently, the State's copy of the deposition had pages missing); Gamez's reluctance to speak to the prosecutor without Guevara's permission and the court's approval on the record; and Gamez showing photographs of Salinas and her brother to Cadena and Cadena not being able to positively identify Salinas as the woman who came to the office on the day of the murder. During closing, the prosecutor stated, in part referring to his questioning of Gamez, "it offends me when people don't uphold the professional standards we expect them to as licensed attorneys in this state.... This defendant gets Jesse Games [sic] and Jesse makes a mistake. Anybody who has seen Perry Mason knows you don't go out and do your own investigation work when you are an attorney. That is what you get Paul Drake for, otherwise you get in the embarrassing situation of being called as a witness against your client when things don't go the way you hope they do."

At trial, only a "sidebar" objection was lodged to the witness's testimony, which objection was overruled. Because Guevara did not object to Gamez's testimony or the prosecutor's argument, he did not preserve error.

### B. *Withholding Brady evidence*

■■■ Guevara's sixth issue complains that the State did not reveal to the defense a statement by the shooting range manager that it would be difficult to connect casings picked up at the range to any particular weapon. The State has an affirmative duty to disclose to the defense evidence that is favorable to the defendant. *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). To prevail on his *Brady* claim, appellant must show that the State's tardy disclosure or nondisclosure prejudiced him. *Little v. State,* 991 S.W.2d 864, 867 (Tex.Crim.App.1999). To show prejudice, appellant must show a reasonable probability that, had the evidence been disclosed to the defense earlier, the result of the proceeding would have been different. *Id.* at 866.

Here, Guevara has not shown that he was prejudiced. The evidence was not exculpatory because the manager's statement about the difficulty of matching casings to a particular gun weakens Guevara's argument that he recovered his own casings from the range. Further, this argument does not have much merit because defense counsel saw a copy of the manager's statement in the State's file, but he did not see anything in the file about difficulty in identifying casings.

### C. *Guevara's statement about making a silencer*

■■■ Guevara's seventh issue complains the trial court erred in admitting Knauss's statement that Guevara had told him that he researched how to make a silencer for a gun. During Knauss's testimony, Guevara objected to the statement, arguing it was irrelevant, hearsay, and lacked probative value. On appeal, Guevara maintains that the statement had no probative value because there was no evidence of a silencer on the weapon used to kill Velia and no evidence about the noise, if any, when the weapon was fired at Velia.

We review the trial court's decision to admit evidence under an abuse of discretion standard. *Avila v. State*, 18 S.W.3d 736, 739 (Tex.App.-San Antonio 2000, no pet.). Guevara contends the error in admitting the evidence affected his substantial rights because the jury was asked to consider the remark as evidence of his guilt. The State contends the remark was probative of Guevara's plan to murder Velia. We agree with the State that evidence showing intent is relevant. *Moreno v. State*, 858 S.W.2d 453, 463 (Tex. Crim.App.1993). More specifically, evidence is "relevant" if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." TEX.R. EVID. 401. Questions of relevance should be left largely to the trial court, relying on its own observations and experience, and will not be reversed absent an abuse of discretion. *Moreno*, 858 S.W.2d at 463. We conclude the trial court did not abuse its discretion when it determined that Knauss's statement was relevant to a fact of consequence.

## CONCLUSION

We reverse the trial court's judgment and remand the cause for a new trial consistent with this opinion. Because we remand this cause for a new trial, we do not reach the issue of whether defendant's attorney provided ineffective assistance of counsel.

Dissenting opinion by CATHERINE STONE, Justice (joined by ALMA L. LÓPEZ, Chief Justice).

I agree that the error in the jury charge was harmful. However, I respectfully dissent from the majority's opinion that the evidence was legally and factually sufficient to support the conviction. James Guevara was not indicted for being "invincibly ignorant of the science of firearms and toolmark experts." He was indicted for the murder of his wife. Because the State failed to prove the elements of the offense, the judgment of the trial court should be reversed.

Guevara claims the evidence is legally insufficient to support his conviction, either as a principal or as a party. I agree. Despite an indictment charging Guevara as a principal, it is undisputed that Guevara was golfing with a friend at the time of his wife's murder. Under this record, no rational trier of fact could have found Guevara guilty as a principal actor. Accordingly, the State proceeded at trial under the theory that Guevara was guilty as a party to the murder. *See Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979).

When conducting a legal sufficiency review, a vital fact may not be established by stacking inference upon inference. *See Richardson v. State*, 834 S.W.2d 535, 537 (Tex.App.-Houston [1st Dist.] 1992, pet. ref'd) (op. on reh'g). As applied in the instant case, Guevara's intent to aid or assist Minnie Salinas in committing the murder of his wife is a vital fact that cannot be established by stacking inferences. To prove Guevara's guilt as a party, the State had to demonstrate that he intentionally aided or assisted Salinas in committing his wife's murder. The State attempted to do this by arguing that because nine millimeter bullets and casings were found at the crime scene and in Guevara's car, and because the casing recovered at the crime scene was fired from the same gun as two casings found in Guevara's car, Guevara did in fact own a nine millimeter gun, and further, that this never-recovered gun was in fact the murder weapon. The jury next had to infer that the nine millimeter gun in question

was given by Guevara to Salinas for her to use in committing the murder. Finally, the jury had to infer that Guevara's golf game was staged because he knew that Salinas intended to shoot his wife that morning. This is a classic case of inference stacking and it cannot support a conviction.

Likewise, Guevara cannot be held responsible under any "legal duty" theory. Under the Penal Code, a person is criminally responsible for the conduct of another if, "having a legal duty to prevent commission of the offense and acting with intent to promote or assist its commission, he fails to make a reasonable effort to prevent its commission." TEX. PENAL CODE ANN. § 7.02(a)(3) (Vernon 1994). The parties here argue about whether a spouse has a legal duty to prevent the assault or murder of the other spouse, but that issue need not be addressed. The critical issue is whether Guevara knew in advance of Salinas' plan to murder his wife. There is no evidence of such knowledge; accordingly, Guevara cannot be held to have a legal duty to prevent the commission of an offense about which he knew nothing.

Because the evidence is legally insufficient to support the conviction either as a principal or as a party, the judgment should be reversed and a judgment of acquittal rendered.