IN THE COURT OF CRIMINAL APPEALS


OF TEXAS






NO. 0424-03






JAMES GEORGE GUEVARA, Appellant



v.



THE STATE OF TEXAS





ON STATE'S AND APPELLANT'S


PETITIONS FOR DISCRETIONARY REVIEW


FROM THE FOURTH COURT OF APPEALS


BEXAR COUNTY






 Price, J., delivered the opinion of the court, in which Keller, P.J., and
Meyers, Womack, Johnson, Keasler, Holcomb, and Cochran, JJ., joined. 
Hervey, J., did not participate.


O P I N I O N 


 

 The appellant challenges his conviction for murder, claiming that the evidence
presented at trial was insufficient to support his conviction as a party to the offense. The
State challenges the judgment of the Court of Appeals with respect to the Court's harm
analysis on jury-charge error. We conclude that the evidence was legally sufficient to
support the appellant's conviction under Texas Penal Code Sections 7.02(a)(2) and
19.02(b). And we hold that the correct standard of review for jury-charge error is Article
36.19 of the Code of Criminal Procedure. We therefore affirm the Court of Appeals on
the former issue and reverse on the latter.

I. Facts and Procedural Background

 On May 26th, 1993, Minnie Salinas, the appellant's mistress, shot and killed Velia
Guevara, the appellant's wife. Sometime before 9:00 a.m., Kathleen Cadena, the property
manager at the appellant's apartment complex, received a call from an answering service,
which reported several calls about a car with its lights on that belonged to the tenant in
apartment 424, the appellant's apartment. At 9:00 a.m., Cadena received another similar
call, and Shelley Selzor, the leasing agent, took another call about fifteen minutes later. 
Cadena told Selzor to contact Velia.

 Cadena said a woman, later identified as Minnie Salinas, came by the office at about
8:45 a.m. The office was not yet open, so the woman returned between 9:15 and 9:30 a.m. 
The woman asked to use the phone. Cadena offered the office phone, but the woman asked
for a pay phone. Cadena directed the woman to the pay phone at the back of the club house. 
The woman was gone for a short time, and then came back through the leasing office
without stopping. George Garza, the maintenance man, also recalled seeing the woman. At
about 10:00 a.m., Velia came to the leasing office to say her car lights were not on. That
was the last time she was seen alive.

 The appellant had left the apartment early that morning and played golf until about
1:00 or 2:00 p.m. Then he spent the next three hours at the San Antonio Light career
services office pursuing prospective employment opportunities. At about 4:00 p.m., he
returned to his apartment, where he found his wife inside the apartment, lying dead on the
hallway floor. 

 During the trial, there was no dispute by either the appellant or the State that Salinas
was the principal actor in the commission of the murder. There was also no dispute that the
appellant had an alibi for the time when Velia was shot. Since the appellant had an alibi for
the time of the murder, the State had to prove that he was criminally responsible for
Salinas's actions in committing the murder.

 The Texas Penal Code provides three separate ways by which a person can be
criminally responsible for the conduct of another. (1) The first way encompasses a situation
in which a person causes an innocent person to engage in criminal conduct. (2) The second
situation occurs when a person "solicits, encourages, directs, aids, or attempts to aid"
another person in committing an offense. (3) The last situation allows a person to be
convicted of a crime if he does not make a reasonable effort to prevent the commission of
an offense when he has a legal duty to prevent the commission of that offense. (4) 

 The State relied on Section 7.02(a)(2) of the Penal Code to show that the appellant
was criminally responsible for Salinas's actions in murdering Velia. The State's theory of
the case was that Salinas and the appellant together plotted to kill Velia. 

 There was no evidence presented at trial that suggested the State relied on the legal-duty theory to find the appellant to be criminally responsible in the death of his wife. 
However, in the abstract portion of the jury charge, the party-liability instruction included
both the aiding language from Section 7.02(a)(2) and the legal-duty language from Section
7.02(a)(3). From the record, it appears that neither the appellant nor the State requested or
objected to the inclusion of the legal-duty language in the charge. 

 On direct appeal, the appellant challenged, inter alia, the legal sufficiency of the
evidence and the inclusion of the legal-duty language in the jury charge. The appellant
argued that the inclusion allowed the jury to convict him for conduct that was not illegal
since he had no legal duty to prevent the murder of his wife, and moreover, the
misstatement of the law deprived him of a fair and impartial trial. 

 The Court of Appeals held the evidence presented at trial was legally sufficient to
convict the appellant on the aiding theory of being a party to an offense. (5) Therefore, the
Court declined to address the sufficiency of the evidence under a legal-duty theory of
liability. 

 In addressing the jury-charge error, the Court of Appeals initially found it to be
harmless. However, on the appellant's motion for rehearing, the Court of Appeals en banc
held that the error was harmful based on its opinion in Bagheri v. State. (6) 

 The Court of Appeals determined that the harm analysis should be conducted under
Texas Rule of Appellate Procedure 44.2(b). Under Rule 44.2(b), a non-constitutional error
must be disregarded unless it affects a defendant's substantial rights. Using this analysis,
the Court of Appeals determined that the submission of the legal-duty theory affected
appellant's substantial rights, and therefore remanded the case for a new trial.

 We granted both the State's and the appellant's petitions for discretionary review to
determine (1) whether the evidence presented was sufficient to support the verdict, (2)
whether the Court of Appeals applied the correct harm analysis to the jury-charge error,
and, if so, (3) whether the Court of Appeals erred in holding that the appellant was harmed. (7) 

II. Legal Sufficiency of the Evidence


 First, we address the appellant's assertion that the evidence was legally insufficient
to support the conviction due to the impermissible stacking of inferences, or alternatively,
because the conviction rested on conduct which was not illegal. (8) 

A. Standard of Review


 The Fourteenth Amendment's guarantee of due process of law prohibits a criminal
defendant from being convicted of an offense and denied his liberty except upon proof
sufficient to persuade a rational fact finder of guilt beyond a reasonable doubt. (9) In
assessing the legal sufficiency of the evidence to support a conviction, we consider all the
record evidence in the light most favorable to the jury's verdict and determine whether,
based on that evidence and reasonable inferences therefrom, a rational jury could have
found the accused guilty of all of the elements of the offense beyond a reasonable doubt. (10) 
Furthermore, when the trial court's charge authorizes the jury to convict on more than one
theory, as it did in this case, the verdict of guilty will be upheld if the evidence is sufficient
on any one of the theories. (11) The law does not require any further speculation as to the guilt
of the appellant. If, given all of the evidence, a rational jury would necessarily entertain a
reasonable doubt as to the defendant's guilt, the due process guarantee requires that we
reverse and order a judgment of acquittal. (12) 

B. The Aiding Theory

 The appellant contends that the evidence was legally insufficient to convict him due
to the impermissible stacking of inferences. The evidence used to convict the appellant
was solely circumstantial. However, the lack of direct evidence is not dispositive of the
issue of a defendant's guilt. Circumstantial evidence is as probative as direct evidence in
establishing the guilt of an actor. (13) Circumstantial evidence alone is sufficient to establish
guilt. (14) Furthermore, the standard of review on appeal is the same for both direct and
circumstantial evidence cases. (15) 

 In reviewing the sufficiency of the evidence, we should look at "events occurring
before, during and after the commission of the offense and may rely on actions of the
defendant which show an understanding and common design to do the prohibited act." (16) 
Each fact need not point directly and independently to the guilt of the appellant, as long as
the cumulative effect of all the incriminating facts are sufficient to support the
conviction. (17)
 

 Motive is a significant circumstance indicating guilt. (18) Intent may also be inferred
from circumstantial evidence such as acts, words, and the conduct of the appellant. (19) 

 The evidence demonstrated that the appellant had a motive to kill his wife. The
appellant was involved in a long-standing affair with Salinas, which was consummated three
days before he married Velia. Three years after the affair began, and one month before the
murder, Salinas issued an ultimatum to the appellant that they would separate "if something
didn't happen by June." The appellant was distressed over this, and stated that he "didn't
want to give Minnie [Salinas] up and couldn't think of a way to end it." The appellant
apparently did not want to divorce Velia because he did not want to cause his family
distress. (20) He and Salinas also talked about getting married, but the appellant stated that he
"didn't see how it was possible." Velia had a substantial retirement account that was to go
to the appellant in the event of her death. Once the money was certain to go to the
appellant, (21) Salinas and the appellant almost immediately got married in Las Vegas. These
facts show that the appellant had a strong motive for murdering his wife.

 Attempts to conceal incriminating evidence, inconsistent statements, and
implausible explanations to the police are probative of wrongful conduct and are also
circumstances of guilt. (22) Lies about an actor's relationship with an accomplice are 
probative of unlawful acts. (23) 

 The appellant made several false statements to the authorities. When the appellant
gave his first statement to the police, he claimed that he and Velia had a good relationship
with no problems and that no one else had any problems with Velia. He mentioned
Salinas's name in the statement, but only as a person to whom he lent a gun, not as a person
with whom he was having an affair, and not a person whom he knew had a motive to kill
Velia. It was only after the police discovered his omissions and confronted him with them
that he detailed his relationship with Salinas. The appellant later lied about his relationship
with Salinas during a deposition taken for a civil case.

 On the day of the murder, the appellant claimed that he dropped Salinas off at work
at 6:30 am, but Salinas called in sick and did not arrive at work until later in the day. The
appellant explained that he had to drive Salinas to work because she told him that her car
had been stolen two days before the murder. However, Salinas rented a car five days before
the murder. Then, on the day of the murder, after the murder had occurred, she extended her
rental contract and switched to a different rental vehicle. Later, when Salinas's car was
recovered, it showed no signs of having been stolen. Based on the appellant's inconsistent
statements, it would be reasonable for a jury to conclude that he attempted to mislead the
police about driving Salinas to work and about her access to transportation. 

 In addition to the evidence of motive and inconsistent statements, other evidence
was presented that suggested the appellant's complicity in the crime. One month before the
murder, the appellant took Velia to a shooting range to practice firing a rented 9mm gun,
the same caliber gun that was used in the murder. He also told a friend, Paul Knauss, that he
was researching how to make a silencer. The day of the murder, the appellant ensured that
he had an alibi for the time of the murder because he was playing golf with Knauss. Knauss
testified that it was out of character for the appellant to ask him to play golf. It was unusual
because Knauss was a bad golfer and appellant had, on previous occasions, said that people
who could not shoot under 100 should not be allowed to play on eighteen-hole golf courses
because they slow everyone down. It had also been some period of time since the appellant
had played golf with Knauss, and on previous occasions, they played only par-three courses
or went to the driving range. The jury could have reasonably concluded that the appellant
was attempting to manufacture an alibi so the police would not be able to connect him to
the murder. 

 The police found two casings in the appellant's car and a third casing on the couch in
the appellant's apartment that were all fired from the same gun. Velia was shot three times. 
The firearms expert testified that the casing found on the couch was probably ejected from
the murder weapon when Velia was shot. Knauss testified that the casings were not in the
appellant's car earlier in the day during the golf outing. In addition, the police found a box
of shell casings under some clothes in the appellant's closet, thirty of which matched the
casings from the murder scene and the appellant's car. After the appellant discovered his
wife's body, he had access to both the apartment and his car before emergency personnel
arrived. The appellant had opportunity to retrieve two casings from the crime scene and put
them in his car, hoping to conceal evidence. Presumably, he did not notice the third casing
which was found in an inconspicuous location. The jury could reasonably conclude that the
shell-casing evidence connected the appellant to the murder weapon. 

 During the trial, the State claimed that Velia had been lured from her apartment with
a phone call so Salinas could surreptitiously enter the Guevara's apartment using a key from
the appellant. There was no sign of forced entry into the apartment, nor was anything
stolen, despite the obvious presence of valuables. The lack of evidence of burglary
suggested that the murder was pre-meditated, not a robbery gone bad. Finally, the appellant
showed little to no emotion after discovering his wife, nor did he appear to be upset at the
crime scene.

 The appellant argues that in order to be convicted as a party to the murder, there
must be proof that he was assisting in the commission of the offense at the time it was
actually committed and that he had knowledge that he was assisting in the commission of
the offense. However, the Penal Code does not require that the party actually participate in
the commission of the offense to be criminally responsible. (24) The Penal Code also does
not require that a party to the crime be physically present at the commission of the
offense. (25)

 Based on the totality of the evidence, a jury could have reasonably concluded that
the appellant was a participant in the murder of his wife and that he knew he was assisting in
the offense. While each piece of evidence lacked sufficiency in isolation, the consistency
of the evidence and the reasonable inferences drawn therefrom were sufficient to support
the verdict. Therefore, after examining all the evidence in the case in the light most
favorable to the prosecution, we conclude that a rational jury could have found all the
elements proved, based on the aiding theory of party responsibility, beyond a reasonable
doubt. 

C. The Legal-Duty Theory

 The appellant alternatively alleges that his conviction was based on conduct that was
not illegal. The rationale for this claim is that, because the appellant had no legal duty to
prevent his wife's murder, he could not be convicted on a legal-duty theory of liability. 
Regardless of whether the appellant had or did not have a legal duty to prevent injury to his
wife, (26) the evidence was sufficient to support the State's other theory of the case, that the
appellant aided Salinas in murdering Velia. We have consistently held that, when multiple
theories are submitted to the jury, the evidence is sufficient to support a conviction so long
as the evidence is sufficient to support conviction for one of the theories submitted to the
jury. (27)

III. The Jury Charge

 The appellant argued in the Court of Appeals that, because the jury charge included
language that allowed the jury to convict him based on either a legal-duty theory or an
aiding theory, it is unknown under which theory the jury convicted. Therefore, since the
jury could not have legally convicted him on legal-duty theory, and there is a possibility
that they did, the appellant argues that the verdict cannot stand. So despite the fact that the
conviction may be upheld under the aiding theory, we still must decide if the error in the
jury charge affected the appellant's trial in such a way that his conviction should be
reversed. (28) 

 The Court of Appeals applied Texas Rule of Appellate Procedure 44.2(b) to the jury
charge in its harm analysis. On original submission, the Court of Appeals held that the jury-charge error in this case was harmless because, although an erroneous theory of culpability
was submitted to the jury, there was sufficient evidence to convict appellant under a valid
theory. The en banc Court of Appeals granted the appellant's motion for rehearing and
reviewed its holding based on their decision in Bagheri v. State. (29) Based on its reasoning
in Bagheri, the Court of Appeals applied Rule of Appellate Procedure 44.2(b) and
concluded that the error affected the appellant's substantial rights. The Court of Appeals
reversed the conviction. We must determine whether the harm analysis used in Bagheri
was the appropriate one under which the jury-charge error in this case should be reviewed.

 Bagheri involved a driving while intoxicated conviction in which retrograde
extrapolation evidence was erroneously submitted to the jury. (30) The jury was charged with
alternative theories of intoxication: (1) absence of the normal use of mental or physical
faculties and (2) a blood-alcohol concentration of 0.10. (31) It was unclear under which
theory the jury convicted the defendant. (32) Without the erroneous admission of evidence,
one of the two theories could not legally have been the basis for a conviction due to
insufficient evidence. 

 In conducting a harm analysis in Bagheri, the Court of Appeals relied on Rule
44.2(b) of the Rules of Appellate Procedure. (33) According to Rule 44.2(b), non-constitutional errors must be disregarded if the error did not affect the appellant's
substantial rights. "Substantial rights are not affected by the erroneous admission of
evidence 'if the appellate court, after examining the record as a whole, has fair assurance
that the error did not influence the jury, or had but a slight effect.'" (34) The Court of Appeals
concluded that it could not tell whether the erroneous admission of evidence "did not
influence the jury, or have but a slight effect," and therefore, held the error to be harmful. (35)

 We affirmed the lower court, holding that, although the Court of Appeals reached
the correct conclusion in Bagheri, its reasoning was flawed. (36) The Court of Appeals based
their holding on the fact that the general verdict made it impossible to determine which
theory the jury had relied on. (37) We stated that "this fact alone is not determinative, because
evidence to prove intoxication under either definition is relevant to the single question of
whether the appellant was, in fact intoxicated." (38) After reviewing the record for the relevant
factors outlined in Motilla v. State (39) and Solomon v. State, supra, we held that we could
not determine whether the erroneous admission of evidence "prejudiced the jury's
consideration of the other evidence or substantially affected their deliberation." (40)

 The Court of Appeals in the instant case used the same harm analysis as it did in its
Bagheri opinion. The harm analysis under Rule 44.2(b) was appropriate in Bagheri
because the issue involved the erroneous admission of evidence and its effect on the jury's
deliberations. 

 This case is distinguishable from Bagheri. The issue in the appellant's case is
whether an erroneous theory in the jury charge affected the verdict, not whether the
erroneous admission of evidence affected the verdict. It is settled law in Texas that error
in a criminal jury charge is reviewed under Article 36.19 of the Code of Criminal
Procedure as interpreted by this Court in Almanza v. State. (41) As a result, we hold that the
Court of Appeals erred in assessing harm under the standard found in Rule 44.2(b).

 III. Conclusion


 We hold that the Court of Appeals did not err in holding that the evidence was
legally sufficient to support the conviction. We also hold that the Court of Appeals erred
in using Rule 44.2(b) as the standard by which to assess harm for the jury-charge error. As
a result of this holding, we need not address whether the Court of Appeals erred in
concluding that the appellant was harmed. We reverse the judgment of the Court of
Appeals and remand the case to that Court to conduct a harm analysis under Code of
Criminal Procedure 36.19. 

Delivered: October 20, 2004.

Publish.
1. Tex. Pen Code § 7.02(a).
2. Tex. Pen. Code § 7.02(a)(1).
3. Tex. Pen. Code § 7.02(a)(2). We refer to this section as the "aiding" theory of criminal
responsibility for the conduct of another.
4. Tex. Pen. Code § 7.02(a)(3). We refer to this section as the "legal-duty" theory of criminal
responsibility for the conduct of another.
5. Guevara v. State, 103 S.W.3d 549, 555 (Tex. App.-San Antonio 2003).
6. 87 S.W.3d 657 (Tex. App.-San Antonio 2002), aff'd, 119 S.W.3d 755 (Tex. Crim. App. 2003).
7. The precise grounds upon which we granted review include whether the court of appeals erred
by: (1) performing a harm analysis of jury-charge error by applying Rule 44.2(b) of the Rules of Appellate
Procedure instead of Article 36.19 of the Code of Criminal Procedure, as construed by Almanza v. State;
(2) reversing appellant's conviction because the jury might have convicted appellant on one erroneous
theory of the offense where there was sufficient evidence to sustain the conviction under an alternative
theory; and (3) finding that the State's evidence was legally sufficient to support appellant's conviction
where legal sufficiency necessarily depended upon a theory of conduct that was not unlawful or,
alternatively, upon the impermissible stacking of inferences. 
8. If the evidence is insufficient to sustain the conviction, then we need not address the other
issues presented in the State's petition for discretionary review.
9. In re Winship, 397 U.S. 358, 362 (1970).
10. Jackson v. Virginia, 443 U.S. 307, 318-19 (1979); Ladd v. State, 3 S.W.3d 547, 557 (Tex.
Crim. App. 1999). 
11. Rabbani v. State, 847 S.W.2d 555, 558 (Tex. Crim. App. 1992). 
12. Narvaiz v. State, 840 S.W.2d 415, 423 (Tex. Crim. App. 1992) (emphasis added).
13. Templin v. State, 711 S.W.2d 30, 33 (Tex. Crim. App. 1986). 
14. Miles v. State, 165 S.W. 567, 570 (Tex. Crim. App. 1914). 
15. Carlsen v. State, 654 S.W.2d 444, 449 (Tex. Crim. App. 1983); Freeman v. State, 654 S.W.2d
450, 456 (Tex. Crim. App. 1983); Denby v. State, 654 S.W.2d 457, 464 (Tex. Crim. App. 1983); Wilson
v. State, 654 S.W.2d 465, 471 (Tex. Crim. App. 1983).
16. Cordova v. State, 698 S.W.2d 107, 111 (Tex. Crim. App. 1985); Thompson v. State, 697
S.W.2d 413, 416 (Tex. Crim. App. 1985). 
17. Alexander v. State, 740 S.W.2d 749, 758 (Tex. Crim. App. 1987); Russell v. State, 665
S.W.2d 771, 776 (Tex. Crim. App. 1983) (The evidence is sufficient "if the conclusion [of guilt] is
warranted by the combined and cumulative force of all the incriminating circumstances.").

18. Harris v. State, 727 S.W.2d 537, 542 (Tex. Crim. App. 1987). 
19. Patrick v. State, 906 S.W.2d 481, 487 (Tex. Crim. App. 1995).
20. Apparently, the appellant's brother had recently gotten divorced. The appellant's parents took
the brother's divorce extremely hard. Therefore, the appellant said he did not want to put his parents
through another divorce. 
21. Velia's family filed a civil suit to prevent appellant from receiving the retirement benefits, due
to his alleged involvement in her death. The civil suit was subsequently dropped so the criminal
investigation would not be impeded.
22. Graham v. State, 566 S.W.2d 941, 951 (Tex. Crim. App. 1978); United States v. Cano-Guel,
167 F.3d 900, 905 (5th Cir. 1999). 
23. Hartson v. State, 59 S.W.3d 780, 788 (Tex. App.- Texarkana 2001, no pet.). 
24. Cross v. State, 555 S.W.2d 61, 63-64 (Tex. Crim. App. 1977) (The defendant was criminally
responsible as a party because he planned the robbery with the actual robbers, even though the defendant
did not actually participate in the robbery).
25. Morrison v. State, 608 S.W.2d 233, 234 (Tex. Crim. App. 1980).
26. While generally a spouse does not have a legal duty to prevent harm to the other spouse, there
can be circumstances under which one spouse could have a legal duty to the other. For example, if one
spouse was a law enforcement official, he or she would have a legal duty to prevent a crime from being
perpetrated on the other spouse. See Medrano v. State, 612 S.W.2d 576, 578 (Tex. Crim. App. 1981). 
Another example could arise where one spouse is incapacitated and the other spouse has legal
guardianship of the incompetent one. However, there was no evidence presented in this case that the
appellant and his wife fell into any of these categories. The question of legal duty between spouses also
arises in civil litigation. See Rampel v. Wascher, 845 S.W.2d 918, 925 (Tex. App.-San Antonio 1992, writ
denied) ("spouses and other family members have no legal right of action against each other arising from
failure to take affirmative action to prevent injury"). 
27. Kitchens v. State, 823 S.W.2d 256, 258 (Tex. Crim. App.1991).
28. We do not address whether the inclusion of the legal-duty theory in the charge was error. 
29. 87 S.W.3d 657 (Tex. App.-San Antonio 2002), aff'd, 119 S.W.3d 755 (Tex. Crim. App. 2003).
30. Id., at 659.
31. Under the version of Penal Code Section 49.01 in effect when Bagheri was arrested, a
person could be shown to be intoxicated for (1) the impairment of physical or mental faculties or (2)
having a blood-alcohol content over 0.10. That section has been amended so that a person may be
shown to be intoxicated if he has a blood-alcohol concentration of 0.08. Act of May 11, 1999, 76th
Leg., R.S., ch. 234, § 1, 1999 Tex. Gen. Laws 1082.
32. Id., at 660.
33. Id., at 659.
34. Solomon v. State, 49 S.W.3d 356, 365 (Tex. Crim. App. 2001).
35. Bagheri, 87 S.W.3d at 661.
36. Bagheri v. State, 119 S.W.3d 755, 763 (Tex. Crim. App. 2003).
37. Ibid.
38. Ibid.
39. 78 S.W.3d 352, 355 (Tex. Crim. App. 2002).
40. Bagheri, 119 S.W.3d at 763. We noted that the issue in Bagheri was not whether the jury
charge set out valid and proper means of committing the offense, or whether there was sufficient
evidence to prove one of the alleged means by which the appellant committed the offense, but instead
whether the erroneous admission of evidence affected the verdict. Id. at 762 n.5.
41. 686 S.W.2d 157 (Tex. Crim. App. 1985).