Minnie SALINAS, Appellant,

v.

The STATE of Texas, Appellee.

No. 04–01–00244–CR.

Court of Appeals of Texas, San Antonio.

May 22, 2002.

Anne More Burnham, The Law Offices of Anne Burnham, San Antonio, for appellant.

Kevin P. Yeary, Assistant Criminal District Attorney, San Antonio, for appellee.

Sitting: PHIL HARDBERGER, Chief Justice, CATHERINE STONE, Justice and SANDEE BRYAN MARION, Justice.

Opinion by SANDEE BRYAN MARION, Justice.

A jury found the defendant, Minnie Salinas, guilty of murder and assessed punishment at fifty years' confinement and a $10,000 fine. In seven issues on appeal, the defendant asserts the evidence is legally and factually insufficient to support the verdict, the State used improper identification methods, evidence regarding her alibi should have been suppressed, and her sentence was determined in violation of the United States and Texas constitutions. We overrule all issues on appeal and affirm the trial court's judgment.

## SUFFICIENCY OF THE EVIDENCE

In her fourth and fifth issues on appeal, the defendant asserts the evidence is legally and factually insufficient to support her conviction. The defendant contends the evidence is insufficient to show that she was the person who shot and killed Velia Guevara, and that her conviction was the result of impermissible stacking of inference upon inference.

When considering a legal sufficiency challenge, this court must review all of the evidence in the light most favorable to the verdict and determine whether any rational trier of fact could have found all of the essential elements of the offense proven beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979); *see also Dewberry v. State*, 4 S.W.3d 735, 740 (Tex. Crim.App.1999). We evaluate all the evidence in the record, both direct and circumstantial, whether admissible or inadmissible. *Dewberry*, 4 S.W.3d at 740. In our review of the factual sufficiency of the evidence, we view all the evidence and we will set aside the verdict only if it is so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust. *Cain v. State*, 958 S.W.2d 404, 407 (Tex.Crim.App.1997); *Clewis v. State*, 922 S.W.2d 126, 129 (Tex.Crim.App.1996). We must defer to the factfinder, and may find the evidence factually insufficient only where necessary to prevent manifest injustice. *See Cain*, 958 S.W.2d at 407. In both sufficiency reviews, the trier of fact may draw reasonable inferences and is the exclusive judge of the witnesses' credibility and the weight to give their testimony. *Jones v. State*, 944 S.W.2d 642, 647–49 (Tex.Crim.App.1996). The standard of review is the same in both direct and circumstantial evidence cases. *Kutzner v. State*, 994 S.W.2d 180, 184 (Tex.Crim.App.1999).

In a prosecution based on circumstantial evidence, it is not required that every fact point directly and independently to the guilt of the accused; the cumulative force of all the incriminating circumstances may be sufficient. *Barnes v. State*, 876 S.W.2d 316, 321 (Tex.Crim. App.1994). However, when conducting a legal sufficiency review, a vital fact may not be established by stacking inference upon inference. *Richardson v. State*, 834 S.W.2d 535, 537 (Tex.App.-Houston [1st Dist.] 1992, pet. ref'd) (op. on reh'g). A jury's inference of intent is afforded more deference than the evidence supporting proof of conduct. *Margraves v. State*, 34 S.W.3d 912, 919 (Tex.Crim.App.2000). Circumstantial evidence of a defendant's guilty knowledge need not meet the same rigorous criteria for sufficiency as circumstantial proof of other offensive elements. *Id.* This court is not required to find the defendant's intent to its own satisfaction. *Brimage v. State*, 918 S.W.2d 466, 476 (Tex.Crim.App.1994). It is enough for us to find that "any" rational jury could have so found beyond a reasonable doubt. *Id.*

Velia Guevara was murdered on May 26, 1993; the murder weapon, a nine millimeter gun, was never found. The defendant and Velia's husband, Jim Guevara, had begun an affair three days before Jim married Velia. The affair lasted throughout the Guevaras' marriage. Eventually, defendant grew weary of waiting for Jim to leave his wife, as he had promised on several occasions. Defendant gave him an ultimatum: chose her or Velia by June or July 1993.

The Guevaras lived in the Contour Place Apartments, apartment number 424. Allen Galloway had an office in a building across from the Guevaras' apartment. On the day before Velia's murder, Galloway's housekeeper told him about a car that had been sitting outside on Contour Street.

When he went outside to investigate, the car drove off as he walked toward it. The car was white and had an Enterprise Rent–A–Car logo with the letter "E" on its bumper. Galloway identified the defendant as the driver. He said the defendant seemed to be looking intently at building number four of the apartments. After the defendant drove away, Galloway went to his own car, and as he walked to his car, he saw defendant drive back to the same spot he first saw her car. He noticed the car go back and forth for about an hour.

The records kept by Enterprise Rent–A–Car indicate the defendant rented three cars. The first car was a white Ford Tempo, rented on May 20, 1993. On the day of the murder, the defendant traded the Tempo for a white Ford Escort. Later that same day, she traded the Escort for a red Chevrolet Baretta. The defendant had reported her car as stolen, but when the police recovered her car it showed no damage from a forced entry.

On the day of the murder, Jim played golf with a former co-worker. He was away from the apartment from early in the morning until about 4:00 p.m., when he returned to the apartment to find his wife dead.

Kathleen Cadena, property manager at the Guevaras' apartment complex, arrived at work at about 8:00 a.m. on the day of the murder. At about 8:45 a.m., a woman later identified as the defendant came to the office door, stood outside the door, and then left. Sometime before 9:00 a.m., Cadena received a call from the answering service, which reported that a male caller had said a black Mazda in the back parking lot had its lights on. The caller said the car belonged to the resident in apartment 424. At 9:15 a.m., Cadena received a call from a female caller, who said a black car in the back parking lot had its lights on.

Shelley Georgiu, the leasing agent, arrived at the apartment offices around 9:30 a.m. About five minutes after she arrived, she answered a call from a woman who said a black Mazda in the back parking lot had its lights on. George Garza, the maintenance supervisor, told Georgiu that Velia had a black Mazda, so Georgiu left a message for Velia on the Guevaras' answering machine. Velia returned the call almost immediately to say she had been in the shower, but she would check her car.

In the meantime, the defendant returned to the apartment offices to ask if she could use a telephone. She was offered a telephone in the offices, but she declined because she wanted to use a pay phone. The defendant walked out the backdoor, towards a pay phone. Shortly after the defendant left, Velia arrived in the office to say her car lights were not on. She thanked the people in the office and left through the backdoor. At around 9:30 a.m., Galloway saw Velia walking her dog. Both Galloway and Garza later saw the dog, who was always kept on its leash, wandering about on its own.

Jim Guevara found his wife's body at about 4:00 p.m. The police did not begin a burglary investigation because there was no sign of forced entry into the apartment, the apartment was relatively neat, and several items of value were still in the apartment. The medical examiner estimated Velia died from three gunshot wounds to the abdomen sometime between 10 a.m. and 12:00 p.m. The time of death was not released until after the autopsy.

The investigation uncovered a box of fifty-nine millimeter shell casings, one casing on the apartment couch, and three nine millimeter bullets (one from Velia's body) in the apartment. Three nine millimeter casings were found in Jim's car. Ballistics evidence showed the casing from the

apartment couch, two casings from Jim's car, and thirty of the casings in the box of fifty were all fired from the same gun.

On the day before the murder and the day of the murder, the electronic entrance system at USAA, the defendant's employer, showed that the defendant twice used her access card to gain entry to the building, but the system did not show her exiting the building between the two entries. On the day of the murder, the electronic system showed defendant entering the USAA building at 6:41 a.m. and again at 10:42 a.m., the first "exit" shown on the system was at 12:16 p.m.

Following the murder, the defendant spoke to two friends, both of whom testified at trial about the conversations. The defendant admitted to both friends she was not at work when Velia was shot. However, she asked Perla Ostos to tell the police that she (Ostos) had called the defendant at work. The defendant told both women she had Jim's nine millimeter gun. Conversations with both friends indicated the *defendant knew when Velia had been murdered*, although that information had not yet been released to the public.

A few years after the murder, defendant attempted to alter her medical records to show she had been at the doctor's office when Velia was murdered.

We conclude that the above evidence is legally and factually sufficient to support the verdict, and we overrule defendant's fourth and fifth issues.

### DEFENDANT'S SENTENCING

█ In her first, second, and third issues, the defendant asserts her punishment was assessed in violation of the Establishment Clause of the First, Fifth, Sixth and Fourteenth Amendments to the United States Constitution and Article I, sections 6 and 7 of the Texas Constitution.

Defendant claims that because the jurors visited a Catholic cathedral during a break in punishment deliberations, she was deprived of her right to an impartial jury trial presided over by an impartial judge.

During punishment deliberations, the jury sent the following note out to the judge: "Request that a juror be allowed to go to church (San Fernando) for 20 minutes." After receiving the note, the trial court stated to the prosecutor and defense counsel: "Okay. We received a note. The jury has been deliberating, I guess they got back from lunch around 1:30 or a little after, they have been deliberating since then. We received a note. The foreman has asked that a juror be allowed to go to church, specifically San Fernando Cathedral, for twenty minutes." After the prosecutor and defense counsel reviewed the note, the court stated that if the request was honored, the jury would not be allowed to separate; therefore, every one or no one could go. The court said it would not object to the jury taking a walking break to the cathedral instead of going to the cafeteria. Both the prosecutor and defense counsel said they would defer to the court. Noting that there was no objection, the court informed the jury it could go anywhere it wanted to during its break, within reason, but it had to stay together. The jury went to San Fernando Cathedral.

On appeal, defendant acknowledges that she did not object to the jury going to the cathedral, but she relies on *Blue v. State*, 41 S.W.3d 129 (Tex.Crim.App.2000) (plurality op.), for her argument that the trial court's actions denied her the fundamental right to an impartial judge. In *Blue*, the Court of Criminal Appeals held that a judge's comments to the jury, which tainted the presumption of innocence, were *fundamental error of constitutional proportion* and required no objection. *Id.* at 132. Defendant contends the judge here was

impartial because he endorsed the Catholic religion as it applied to her sentencing, and this fundamental error of constitutional proportion likewise required no objection. Defendant's argument has no merit.

■ Almost every right, constitutional and statutory, may be waived by the failure to object. *Smith v. State,* 721 S.W.2d 844, 855 (Tex.Crim.App.1986); *Borgen v. State,* 672 S.W.2d 456, 460 (Tex.Crim.App. 1984). Here, the trial court neither encouraged nor prevented the jury's excursion to a nearby cathedral during its break. The court asked for objections to the jury's request, and defense counsel deferred to the court's decision to allow the jury to go to a cathedral. We do not agree with defendant that the trial court erred in its decision, and furthermore, any error was waived by defense counsel's acquiescence in the court's decision. *See Dean v. State,* 749 S.W.2d 80, 83 (Tex. Crim.App.1988) (when defense counsel affirmatively states "no objection" to admissibility of evidence introduced at trial, right to object to its admission on appeal is waived); *Welch v. State,* 993 S.W.2d 690, 694 (Tex.App.-San Antonio 1999, no pet.) (same). Therefore, we overrule defendant's first, second, and third issues.

### IDENTIFICATION PROCEDURES

■ In her sixth issue, defendant complains that the use of two different out-of-court photo arrays used to identify her were suggestive and tainted the in-court identification.

■ A pre-trial identification procedure may be so suggestive and conducive to mistaken identification that later use of that identification at trial denies the defendant due process of law. *Barley v. State,* 906 S.W.2d 27, 32–33 (Tex.Crim.App.1995). Courts engage in a two-step analysis to determine the admissibility of an in-court identification: was the out-of-court identification procedure impermissibly suggestive; and did that suggestive procedure give rise to a very substantial likelihood of irreparable misidentification. *Id.* This analysis requires an examination of the "totality of the circumstances" surrounding the particular case and a determination of the reliability of the identification. *Id.*

Defendant complains of several instances that she alleges contributed to a tainted in-court identification. Cadena could not identify her in the photo line-up because the array contained photos of hispanic females who looked like the defendant, and at trial, Cadena was allowed to testify that defendant "shared" similar features with the woman who was at the apartment complex the morning of the murder. Garza did not identify defendant the first time he saw a photo array, but he later identified her from a second and different array. Garza said defendant's photo in the second array was "dead center," one of the largest pictures, and the only one that depicted a side view. Detective Gonzales testified that he knew Jim Guevara and his lawyer had shown defendant's picture to witnesses at the apartment complex. Gonzales admitted this could have influenced later identifications. While we agree that any of these instances may have been suggestive, we do not agree the procedure utilized by the police was impermissibly suggestive.

The police compiled and used two photo arrays. The first array was composed of photographs of the defendant and other women that the police obtained from USAA. In the photographs, which one detective described as "professionally done," the women were hispanic, with the same general hair style.

Shelly Georgiu was shown the first array two days after the murder, and she identified the defendant as the woman she

saw in the apartment offices asking to use the telephone on the day of the murder. Georgiu said the only difference between the woman she saw and the woman in the photo array was the hair style; the woman in the office had bangs, but the woman in the picture did not. Georgiu also identified the defendant in court as the woman who came into the apartment offices the day of the murder.

When George Garza and Kathy Cadena viewed the first photo array, neither could identify the woman they saw in the apartment offices. The police then compiled a second array of larger photos and, less than two weeks later, showed this array to Garza and Cadena. This time, Garza identified the defendant as the woman he saw at the apartments the day of the murder. In the second photo array, which contained two rows of three photos, defendant's picture was in the center of the bottom row and was one of two pictures slightly larger than the other four.

A few days later, Jim Guevara and his attorney went to the apartment office and asked Cadena to look at two photos of the same woman and one picture of a man. Cadena identified the two photos of the woman as the woman who came into the apartment office on the day of the murder. A few days later, Cadena again met with a detective to give her statement and look at the second photo array. She could not recognize any of the women in the photos. Cadena said all the women in the photo array looked similar in that they were all hispanic females. She told the detective she had recognized the woman in the two photos shown to her by Jim and his attorney. She said the lawyer showed the photos to Garza and possibly to Georgiu. In court, Cadena said the defendant had the same facial features as the woman she saw on the day of the murder.

Allen Galloway identified the defendant, from the second photo array, as the woman he saw in the white car the day before the murder. Galloway chose the same photo of the defendant that Garza chose when he viewed the array.

At trial, when Cadena was asked if anyone in the courtroom shared the facial features of the woman she saw in the apartment offices, she identified the defendant. All other witnesses positively identified the defendant in court.

We hold that the out-of-court identifications procedures were not impermissibly suggestive; therefore, we do not consider whether the procedures used by the police to identify the defendant created a substantial likelihood of misidentification. We overrule issue six.

## FABRICATION OF ALIBI EVIDENCE

■■■ In issue eight, defendant asserts the trial court erred in admitting into evidence medical records the State alleged she had altered to support her alibi that she was at a doctor's office the morning of the murder.

State's Exhibit 47 was a medical record that purported to establish defendant's alibi. State's Exhibits 48 and 48–A were an envelope and medical files the State argued showed that Exhibit 47 had been altered. The State obtained Exhibits 48 and 48–A in the following manner. A parcel was mailed, by United States mail, to Jim Guevara and the defendant. The envelope (Exhibit 48) bore the message "private/confidential" and was mailed to Jim's parents' address. While visiting her parents, Jim's sister, Cynthia Sanchez, began opening mail addressed to her. She opened the parcel addressed to Jim and the defendant, thinking it was one of her own packages. The envelope contained a medical file (Exhibit 48–A). Sanchez called Jim's attorney, Judith Saldana, and

told her the file contained the defendant's medical records. Sanchez delivered the envelope and files to Saldana, who in turn, gave them to the district attorney.

At trial, Sanchez admitted she was not authorized to open her brother's or the defendant's mail. A prosecution witness testified that the date on Exhibit 48–A appeared to have been altered. Defense counsel objected to the admission of the evidence on the grounds that the envelope was opened in violation of federal and state law precluding the opening of another's mail. The objection was overruled, but the trial court instructed the jury that if it determined beyond a reasonable doubt, or if it had a reasonable doubt, that Sanchez opened the envelope in violation of federal or state law, it should disregard the evidence and not consider the medical records for any reason.

During deliberations, the jury sent out two notes: "What is [a] violation of Federal Law of the United States with respect to opening envelopes through the U.S. Postal Service?" and "Can we decide to consider the envelope and medical records by a majority vote?" The record does not indicate if or how the questions were answered.

We review the trial court's ruling regarding the admissibility of evidence under an abuse of discretion standard. *Salazar v. State*, 38 S.W.3d 141, 153–54 (Tex.Crim.App.2001). The trial court's ruling on the admission or exclusion of evidence will not be disturbed unless the record clearly demonstrates an abuse of such discretion. *DeLeon v. State*, 985 S.W.2d 117, 119 (Tex.App.-San Antonio 1998, pet. ref'd); *De La Garza v. State*, 898 S.W.2d 376, 378 (Tex.App.-San Antonio 1995, no pet.). To demonstrate an abuse of discretion, the appellant must show that the trial court acted arbitrarily and without reference to guiding principles. *Ra-*

*mirez v. State*, 973 S.W.2d 388, 391 (Tex. App.-El Paso 1998, no pet.). Here, the record does not support the defendant's assertion that the trial court abused its discretion in admitting Exhibits 48 and 48–A, nor does defendant explain how the court might have abused its discretion. Therefore, we overrule issue eight.

### CONCLUSION

We affirm the trial court's judgment.