*Court Of Appeals*
*Fourth Court of Appeals District of Texas*
*San Antonio*


## OPINION

No. 04-07-00027-CR

James George **GUEVARA**,
Appellant

v.

The **STATE** of Texas,
Appellee

From the 226th Judicial District Court, Bexar County, Texas
Trial Court No. 1999-CR-1818B
Honorable Pat Priest, Judge Presiding[1]

Opinion by:     Karen Angelini, Justice
Concurring opinion by: Steven C. Hilbig, Justice

Sitting:        Karen Angelini, Justice
                Sandee Bryan Marion, Justice
                Steven C. Hilbig, Justice

Delivered and Filed:   January 28, 2009

AFFIRMED

Appellant James George Guevara was found guilty of the 1993 murder of his wife, Velia

Guevara, and was sentenced to life in prison. On appeal, he raises the following issues: (1) the trial

court committed reversible error in admitting an out-of-court statement by Minnie Salinas as a

statement by a co-conspirator pursuant to Texas Rule of Evidence 801(e)(2)(E); (2) the admission

---

[1] ⬆ Sitting by special assignment

of Salinas's out-of-court statement violated Guevara's right to confrontation and cross-examination guaranteed under the Sixth and Fourteenth Amendments to the United States Constitution; (3) the evidence was legally and factually insufficient to support Guevara's conviction as a party to the murder of his wife; and (4) the trial court erred in refusing to instruct the jury on the law of parties as requested by Guevara. We affirm.

## PROCEDURAL BACKGROUND

Guevara was originally tried and convicted for the murder of his wife, Velia, in 2000. On appeal, this court, sitting en banc, held the evidence was legally and factually sufficient, but reversed and remanded based on an error in the court's jury charge. *Guevara v. State*, 103 S.W.3d 549, 556 (Tex. App.—San Antonio 2003) (en banc), *rev'd*, 152 S.W.3d 45 (Tex. Crim. App. 2004). The Texas Court of Criminal Appeals agreed with this court's holding that the evidence to support Guevara's conviction was legally sufficient and that the trial court erroneously charged the jury; however, the Court remanded the case for this court to properly conduct a harm analysis pursuant to article 36.19 of the Texas Code of Criminal Procedure, rather than under the standard set forth in Texas Rule of Appellate Procedure 44.2(b). *Guevara v. State*, 152 S.W.3d 45, 52-54 (Tex. Crim. App. 2004). Upon remand, this court held that the jury charge error was not harmless and remanded to the trial court for a new trial. *Guevara v. State*, 191 S.W.3d 203, 210 (Tex. App.—San Antonio 2005, pet. ref'd) (en banc). Upon retrial, Guevara was again convicted. It is this conviction from which he now appeals.

## FACTUAL BACKGROUND

Guevara was involved in a long-standing affair with Minnie Salinas, an affair that began only three days before his marriage in 1990 to his wife, Velia. In April 1993, Guevara was told by Salinas

that they would have to go their separate ways if something did not happen by June. On May 26, 1993, less than one week before Salinas's June deadline, Velia was murdered in the apartment in which she and Guevara lived. The murder weapon was never recovered. It is undisputed, however, that Salinas shot and killed Velia with a nine-millimeter gun. The State charged Guevara as a party to the crime.

On the day Velia was murdered, Guevara left his apartment at about 6:30 a.m., picked up Salinas, and dropped her off at work. He then met a friend, Paul Knauss, for a round of golf at Mission Del Lago golf course. Guevara and Knauss rode together in Guevara's car to the golf course. According to Knauss's testimony at trial, a couple of months before Velia's murder, Guevara and he had a conversation, during which Guevara mentioned that he had been researching how to make a silencer on the internet. Additionally, Knauss testified that he was surprised Guevara had invited him to play golf on the day in question. According to Knauss, he had once heard Guevara state that a beginner should never be on a golf course because of the risk of hitting someone with the ball. Thus, Knauss was surprised that Guevara would invite him, a beginner who had never played on an eighteen-hole golf course.

Also on the day of the murder, at about 8:00 a.m., Kathleen Cadena, property manager at the Guevaras' apartment complex, arrived at work. According to Cadena's trial testimony, sometime before 9:00 a.m., she received a call from the apartment's answering service, telling her about several calls reporting a vehicle with its lights on. At least two more calls of a similar nature came in to the office, identifying the vehicle as belonging to the tenant in Apartment 424. Apartment 424 was rented by the Guevaras. According to Cadena, Velia Guevara was then contacted and told that her car lights were on.

Cadena stated that a woman, later identified as Minnie Salinas, came to the office at about 8:45 a.m., but the office was not yet open. Between 9:15 and 9:30 a.m., after the office had opened, Salinas returned and asked to use the phone. Cadena offered the office phone, but Salinas asked for a pay phone. Cadena directed Salinas to the pay phone at the back of the club house. Salinas was gone for a short time, but then walked back through the apartment office without stopping. At about 10:00 a.m., Velia came to the apartment office and reported that her car lights were not on. This was the last time Velia was seen alive. It was determined later that Velia died sometime between 10:00 a.m. and noon.

Meanwhile, Guevara played golf with Knauss until about 1:00 or 2:00 p.m. and then spent some time at the San Antonio Light newspaper career services office pursuing prospective employment opportunities. Guevara was a former employee of the newspaper, which had recently ceased operation, and former employees were provided an office to search for employment. At about 4:00 p.m., Guevara returned to his apartment complex, where he discovered his dog running loose in the parking lot. Guevara retrieved the dog and headed toward his apartment. He noticed the door was ajar and, upon entering, saw his wife lying on the hallway floor. His first impression was that she had fainted, but her eyes were open, and she was cold to the touch. Guevara dialed 911 and stated, "My wife is laying [sic] on the ground. She's cold. I haven't been home all day. She's stiff." Emergency personnel and police officers responded to the call and determined Velia Guevara was dead. According to police officers, when they arrived at the murder scene, Guevara showed no emotion.

The police officers also reported that the apartment showed no sign of forced entry. They discovered that Velia Guevara had suffered three gunshot wounds to the abdomen. One bullet was

recovered from her body, one bullet was found on the floor of the bedroom the couple used as their office, and one bullet was found behind a door by the entryway. Also, one cartridge casing was found on a pair of jeans on the couch in the bedroom the Guevaras used as an office. An officer testified that a logical deduction would be that this casing had been ejected from the murder weapon. A full box of fifty, spent nine-millimeter cartridge casings, of various brands, was found in the office closet under a pile of clothes. Inside Guevara's car, officers found a pawn shop receipt for a nine-millimeter gun and three spent nine-millimeter-cartridge casings in the front seat console. However, although Guevara had a receipt for a nine-millimeter gun, he never picked it up from the pawn shop. A police officer testified that, upon searching Guevara's vehicle, almost immediately upon opening the car, he observed three nine-millimeter shell casings visible in the console area. However, on cross-examination, the officer admitted to having had previously testified that he was not entirely certain the casings were in plain view on the console or if they were inside the console. Paul Knauss, Guevara's friend with whom he played golf the day of Velia's murder, testified that he did not see any casings in Guevara's car.

Richard Stengel, the State's firearm and tool mark expert, examined the bullet taken from Velia's body and the two bullets found inside the apartment. He concluded that all three bullets were nine millimeters and had been fired from the same gun. Stengel examined the fifty casings from the box recovered from Guevara's apartment and the four loose casings recovered from the apartment and the car. He concluded all fifty-four casings were nine millimeters and had been fired from four different nine-millimeter guns. Stengel further testified that the one casing from the apartment couch, two casings from Guevara's car, and thirty of the casings in the box of fifty were all fired from the

same gun. According to Stengel, the third casing from Guevara's car and ten of the casings from the box of fifty were fired from the same gun.

Guevara accompanied the homicide detective to the police station to give a written statement. Guevara stated that he owned a shotgun and a .22-caliber revolver, which he had loaned to Minnie Salinas. He also told police about the nine-millimeter pistol on layaway at a pawn shop. Guevara told police that he had shot a nine-millimeter gun at a shooting range about a month earlier. At the range, he had bought a box of bullets and had picked up empty casings for his brother-in-law to reload. Some of those empty casings, according to Guevara, were in his car. Guevara also told police that he and Velia were happy together and did not have any problems. Guevara did not tell the police about his affair with Salinas. That night, after speaking with the police, Guevara called Salinas.

After midnight, on the night of Velia's murder, Salinas called her friend, Tina Timmerman.[2] According to Timmerman, Salinas asked Timmerman to say, if anyone asked, that Salinas had lent Timmerman her .22 gun. Because Timmerman had not borrowed a .22 gun from Salinas, she questioned Salinas. Salinas told Timmerman that she should claim to have Salinas's gun because Salinas had borrowed Guevara's nine-millimeter gun. Salinas also told Timmerman about Velia's murder. The following day, Timmerman heard on the news that Velia had been shot with a nine-millimeter gun. She called the police to report that she might have some information about the murder. Timmerman then had several conversations with Salinas while also talking to the police. Later, when she asked Salinas about having Guevara's nine millimeter, Salinas changed her story and said she had borrowed a .22 from Guevara, not a nine millimeter. Timmerman also told the police about the affair between Guevara and Salinas.

---

[2] At the time of trial, Tina Timmerman had changed her name to Tina Timmerman Lopez.

Armed with this new information, the police called Guevara back in for a second written statement. Guevara initially denied having an affair with Salinas, but eventually admitted to it. Guevara described his affair with Salinas, which had gone on for about three years. Guevara told the police that when he went to the firing range, he had taken Salinas so she could shoot her .25-caliber handgun. Guevara also said that he rented a nine-millimeter gun at the range. Both Guevara and Salinas fired the .25 and the nine millimeter at the firing range. The range had only one nine-millimeter gun available to rent. Guevara also stated that he purchased a box of nine-millimeter shells at the firing range and that he collected what he could of the spent casings because his brother-in-law was going to reload them for him. Guevara stated that he put these spent shells in a box and, after returning from the shooting range, placed them in his closet. Guevara insisted that, other than the nine millimeter he had on layaway, he did not own a nine-millimeter gun and that the only nine millimeter he had shot was the one he and Salinas rented at the range. Guevara additionally told the police that he had loaned Salinas his .22-caliber revolver because she was having a problem with her neighbors and that Salinas had loaned her own .25-caliber gun to her friend, Tina Timmerman.

The firearms expert, Stengel, compared a nine-millimeter casing that a detective shot from the shooting range's rental nine-millimeter gun to the bullets and casings found at the crime scene and Guevara's car. Stengel later requested the actual gun and determined that the rented gun did not fire any of the casings found at the crime scene, in the box of fifty casings, or in the car. Guevara insisted the rented nine millimeter was the only gun he had fired and that the casings found in his car and apartment were casings he collected from the firing range on the day he went with Salinas. Guevara took the position that he must have unknowingly collected spent casings from other unidentified nine-millimeter guns that had been fired at the range.

In addition to Tina Timmerman, another of Salinas's friends, Perla Ostos, testified. Ostos had several conversations with Salinas on the evening of the murder. Specifically, Ostos testified that Salinas claimed to have in her possession Guevara's gun. Ostos did not, however, say what kind of gun. According to Ostos, Salinas became visibly upset when Ostos informed her that it could be determined whether the gun had been recently fired.

Sometime after Velia's murder, her family hired an attorney to file suit against Guevara, claiming he should not receive Velia's teacher retirement fund. In March 1995, the family's attorney took Guevara's deposition. According to the family's attorney, during the deposition, Guevara was uncooperative and evasive. Guevara claimed that he had not seen Salinas in more than year and that he had no intention of resuming a relationship with her. On June 21, 1995, the lawsuit concerning Velia's teacher retirement funds was settled. Ten days later, Guevara and Salinas married in Las Vegas, Nevada. At the time of the wedding, Salinas, who had started using her middle name, "Bronte," was pregnant with Guevara's child.

Salinas was later charged and found guilty of murdering Velia. *See Salinas v. State*, 88 S.W.3d 677, 679 (Tex. App.—San Antonio 2002, no pet.). She was sentenced to fifty years of imprisonment and assessed a $10,000 fine. *Id.* Guevara was found guilty as a party and sentenced to life in prison.

### SUFFICIENCY OF THE EVIDENCE

Guevara argues that the evidence is both legally and factually insufficient to support his conviction as a party to Velia's murder. We disagree.

In a legal sufficiency review, we view the evidence in the light most favorable to the verdict and then determine whether a rational trier of fact could have found the essential elements of the

offense beyond a reasonable doubt. *Prible v. State*, 175 S.W.3d 724, 729-30 (Tex. Crim. App. 2005). In a factual sufficiency review, we view all the evidence in a neutral light and will set the verdict aside only if the evidence is so weak that the verdict is clearly wrong and manifestly unjust, or the contrary evidence is so strong that the standard of proof beyond a reasonable doubt could not have been met. *Id.* at 730-31.

Here, the State charged Guevara as a party to the offense of murder. There was no dispute that Salinas was the principal actor in the commission of the murder or that Guevara had an alibi for Velia's murder. The State's theory was that Salinas and Guevara plotted together to murder Velia. Thus, the State had to prove that Guevara was criminally responsible for the murder committed by Minnie Salinas by showing that Guevara, acting with intent to promote or assist the commission of the murder, solicited, encouraged, directed, aided, or attempted to aid Minnie Salinas to commit the murder. *See* TEX. PENAL CODE ANN. § 7.02(a)(2) (Vernon 2003).

In order to do so, the State was required to prove, either by direct or circumstantial evidence, that at the time of the offense, Guevara and Salinas were acting together, each contributing towards the execution of their common purpose. *See Pesina v. State*, 949 S.W.2d 374, 382-83 (Tex. App.—San Antonio 1997, no pet.). In considering whether a defendant participated in an offense as a party, we may examine the events occurring before, during, and after the commission of the offense and may rely on actions of the defendant that show an understanding and common design to commit the offense. *Ransom v. State*, 920 S.W.2d 288, 302 (Tex. Crim. App. 1996) (opinion on reh'g). Further, the accused must know that he is assisting in the commission of the offense. *Pesina*, 949 S.W.2d at 382. We can infer such intent from circumstantial evidence, like the accused's acts, words, and conduct. *Patrick v. State*, 906 S.W.2d 481, 487 (Tex. Crim. App. 1995). In considering the

sufficiency of the evidence to establish such intent, and faced with a record that supports conflicting inferences, we must presume that the fact finder resolved any such conflict in favor of the prosecution, and we must defer to that resolution. *Clayton v. State*, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007).

In his first appeal, Guevara contended that the evidence was legally insufficient to support the finding that he was a party to the murder of his wife; however, the Court of Criminal Appeals held that, based on the totality of the evidence, a jury could have reasonably concluded that he was a participant in the murder of his wife and that he knew he was assisting in the offense. *Guevara*, 152 S.W.3d at 49-52. The evidence adduced at the second trial was similar to that of the first trial. Unlike his first trial, however, at the second trial Guevara testified in his own defense. Guevara offered innocent explanations for the circumstantial evidence relied on by the State to support its theory of his guilt as a party. However, the jury was free to resolve any conflict in the testimony in favor of the prosecution, and we must defer to that resolution. *See Jones v. State*, 944 S.W.2d 642, 647 (Tex. Crim. App. 1996) ("The jury is the exclusive judge of the credibility of witnesses and of the weight to be given their testimony. Likewise, reconciliation of conflicts in the evidence is within the exclusive province of the jury."). Further, at the second trial, for the first time evidence was presented of the out-of-court statements by Salinas to both Timmerman and Ostos. Ostos's testimony established that Salinas claimed Guevara lent a gun to Salinas before Velia's murder. Timmerman's testimony more specifically established that Salinas claimed Guevara lent Salinas a nine-millimeter gun before Velia's murder.

Nevertheless, Guevara argues that the jury improperly drew inferences from the circumstantial evidence without sufficient facts or evidence to support such inferences. Thus, he

argues a rational juror could not have found him guilty beyond a reasonable doubt. The Court of Criminal Appeals has explained that under the *Jackson v. Virginia* appellate standard for legal sufficiency, juries are permitted "to draw multiple reasonable inferences as long as each inference is supported by the evidence presented at trial." *Hooper v. State*, 214 S.W.3d 9, 15 (Tex. Crim. App. 2007). "However, juries are not permitted to come to conclusions based on mere speculation or factually unsupported inferences or presumptions." *Id.* According to the court, there is a vital distinction between a "reasonable inference supported by the evidence at trial," "speculation," and "a presumption." *Id.* at 16. A presumption is "a legal inference that a fact exists if the facts giving rise to the presumption are proven beyond a reasonable doubt." *Id.* In contrast, an inference is "a conclusion reached by considering other facts and deducing a logical consequence from them." *Id.* Speculation is "mere theorizing or guessing about the possible meaning of facts and evidence presented." *Id.* "A conclusion reached by speculation may not be completely unreasonable, but it is not sufficiently based on facts or evidence to support a finding beyond a reasonable doubt." *Id.* According to the court of criminal appeals, juries may "draw multiple reasonable inferences from the evidence (direct or circumstantial)," but they may not "draw conclusions based on speculation." *Id.* Thus, while juries are allowed to draw multiple reasonable inferences from the evidence, whether direct or circumstantial, they cannot draw conclusions based on speculation. *Id.*

In this case, the jury could have inferred that Guevara and Salinas were acting together to murder Velia. Guevara had been having an affair with Salinas for over three years. Shortly before Velia was killed, Salinas issued an ultimatum to Guevara, and just days before this ultimatum expired, Velia was murdered. Further, although Guevara told police during his first interview that he had lent Salinas his gun, he did not tell them about the affair and, in fact, said he and Velia had

no marital problems. Even after the police confronted him about the affair, Guevara continued to deny the affair, only admitting to it much later in the interview. And, during a deposition relating to a civil suit involving Velia's teacher retirement, Guevara again denied having or intending to have a relationship with Salinas. It later came to light, however, that just days after the civil suit was settled, he and Salinas married. Guevara testified at trial that he married Salinas because she was pregnant with his child. Thus, the jury could infer that Guevara consistently lied about his relationship with Salinas in order to distance himself from her and to mislead police and others about his role in planning the murder.

Likewise, Guevara's participation as a party in Velia's murder can be inferred from the evidence regarding the murder weapon and the ballistics evidence. The murder weapon, although identified as a nine millimeter, was never recovered. However, there was evidence from which the jury could reasonably infer that Guevara and Salinas acted in concert with respect to the murder weapon.

Shortly before Velia was killed with a nine-millimeter gun, Guevara took Salinas to a shooting range where he and Salinas both fired a nine-millimeter gun. From this evidence, the jury could have reasonably inferred that Guevara took Salinas to the shooting range so that she could learn how to shoot a nine-millimeter gun, the type of gun used to kill Velia.

The jury could also have inferred that Guevara and Salinas used the murder weapon itself at the shooting range. Guevara testified that he and Salinas fired a rented nine-millimeter gun at the shooting range and that after firing the rented nine-millimeter gun, he picked up and took with him the spent shells. According to Guevara, he picked up these spent shells because his brother-in-law was going to reload them for him. However, none of the spent shells found in Guevara's apartment

and car, fifty-four in all, matched the rented nine-millimeter gun from the shooting range. According to testimony presented at trial, if someone shot a particular gun at a shooting range and then collected spent shell casings, it would be highly improbable to not pick up any shell casings spent from the gun that person was shooting. Additionally, Guevara claimed that he had access only to the nine-millimeter rental, and no other nine-millimeter gun. And, although none of the shell casings matched the rental nine-millimeter gun, thirty-three of the shells casings found in the apartment and the car matched each other; that is, they had all been fired from the same gun. Thus, the jury could have reasonably inferred that this unknown gun was the undiscovered murder weapon and that Guevara and Salinas used this gun at the shooting range.

Further, the jury had sufficient facts to infer that Guevara moved two of the shells used in Velia's murder to his car, but missed one lying on the couch, in an attempt to cover up the murder. Velia suffered from three gunshot wounds: one bullet was still in her body, one bullet was found on the floor of the bedroom the couple used as their home office, and one bullet was found behind a door by the entryway. However, although Velia was shot three times, only one shell casing was found in the apartment. It was lying on a pair of jeans on the couch in the Guevaras' home office. The two missing shell casings were not found. Three shell casings, however, were found on the console of Guevara's car, and two of these three spent shells matched the one shell found on the couch in the Guevaras' home office. (These two spent shells also matched thirty of the shells found in the box of fifty in the closet of the Guevaras' home office.) And, although Guevara claims these spent shells in his car were a result of him picking up shells at the shooting range, Paul Knauss, who played golf earlier in the day of the murder with Guevara and rode in Guevara's car, did not see any shell casings on the console of Guevara's car. From this evidence, the jury could have inferred that

after playing golf with Knauss, Guevara went home, discovered Velia's body, and moved two of the shell casings lying near Velia's body in an attempt to hide evidence from the police. The jury could have reasonably inferred that the third shell casing, which was found on a pair of jeans on the couch in the home office, was left there because Guevara did not see it and, therefore, did not move it to his car.

Further, Paul Knauss testified that sometime before Velia's murder, Guevara said that he was researching how to make a silencer on the internet. Guevara testified that he had talked about making a silencer with Knauss. Further, there was evidence that at the time Velia was shot and killed in her apartment, no one at the apartment complex heard gunshots. Thus, the jury could have inferred that a silencer was used during Velia's murder.

Also, based on the events leading up to and following the murder, the jury could have inferred that Guevara and Salinas had, in fact, concocted this story about Salinas borrowing Guevara's gun. After giving his statement to the police on the night of the murder, Guevara called Salinas. Guevara told Salinas that he had told police he lent her his gun. Salinas then called Timmerman and asked her to lie about Salinas lending her gun to Timmerman. The jury could have reasonably inferred that Salinas did this in order to give credence to Guevara's statement to the police.

The jury could also have inferred that Guevara arranged to play golf with Paul Knauss on the day of the murder to ensure that he had an alibi for the murder. According to Knauss, he was surprised when Guevara asked him to play on a regulation golf course because Knauss was an amateur golfer and Guevara had said in the past that he did not think amateurs should play on an eighteen-hole course.

Finally, the jury could have inferred that Guevara was a party to the murder based on his lack of emotion at the scene of the murder.

We, therefore, conclude that the evidence is legally sufficient to support Guevara acting as a party to Velia's murder.

With regard to factual sufficiency, Guevara emphasizes that he testified on his own behalf and provided innocent explanations for the circumstantial evidence against him. According to Guevara, his testimony was consistent with the physical and documentary evidence, and was supported by other witnesses. Guevara argues that "the State proved no more than that Guevara was engaged in a tawdry, long-lasting affair." Thus, Guevara argues that the verdict was contrary to the overwhelming weight of all the evidence and was clearly wrong and unjust. We disagree.

The jury is the judge of Guevara's credibility on the witness stand. So, although Guevara, in his testimony, provided innocent explanations, the jury, in finding him guilty, must have disbelieved those explanations. And, as explained above, there was ample evidence to support Guevara's guilt as a party to the murder. Thus, considering all the evidence presented, we hold that the evidence was factually sufficient.

### HEARSAY EVIDENCE

Guevara argues that the trial court erred in admitting the out-of-court statements of Minnie Salinas as a statement by a co-conspirator under Texas Rule of Evidence 801(e)(2)(E). We disagree.

A trial court has discretion to determine the admissibility of statements under the co-conspirator rule. *Legate v. State,* 52 S.W.3d 797, 803 (Tex. App.—San Antonio 2001, pet. ref'd). Thus, we will not disturb the trial court's evidentiary ruling unless the trial court abused its discretion. *See id.* A trial court abuses its discretion if its decision falls outside the zone of reasonable

disagreement. *See Montgomery v. State*, 810 S.W.2d 372, 391 (Tex. Crim. App. 1991) (opinion on reh'g).

Pursuant to Texas Rule of Evidence 801(e)(2)(E), a statement is not hearsay if it is offered against a party and is "a statement by a co-conspirator of a party during the course and in furtherance of the conspiracy." TEX. R. EVID. 801(e)(2)(E). To qualify as an exception to hearsay under Rule 801(e)(2)(E), the State must show that a conspiracy existed, the co-conspirator was a member of or later participated in this conspiracy, and the statement made was the object and purpose of the conspiracy. *Guidry v. State,* 9 S.W.3d 133, 148 (Tex. Crim. App. 1999). It is not required that a conspiracy be charged, only that one be shown to have existed. *See Byrd v. State*, 187 S.W.3d 436, 440 (Tex. Crim. App. 2005). And, the out-of-court statement by a co-conspirator must be more than merely related to the conspiracy; it must actually further the conspiracy. *Guidry,* 9 S.W.3d at 148. A statement furthers a conspiracy if it advances the cause of the conspiracy or serves to facilitate it. *Id.*; *see Byrd,* 187 S.W.3d at 443.

Guevara argues that Salinas's out-of-court statements to Timmerman were neither made during the course, nor in furtherance, of a conspiracy. According to Guevara, if a conspiracy existed, it was to kill Velia, and that conspiracy ended when Salinas shot and killed Velia. Thus, Guevara contends that Salinas's statements, made after Velia's murder, were not made during the course of a conspiracy. Additionally, Guevara argues that Salinas's statements were not made in furtherance of any conspiracy "because they involved Salinas's efforts to establish an alibi for herself." In response, the State argues that Salinas's statements were not related to the conspiracy to murder Velia, but were made during the conspiracy to hinder Guevara's apprehension and furthered the objectives of that conspiracy.

Section 38.05(a)(2) of the Texas Penal Code provides that a person commits the offense of hindering apprehension or prosecution "if, with intent to hinder the arrest, prosecution, conviction, or punishment of another for an offense," she "provides or aids in providing the other with any means of avoiding arrest or effecting escape." TEX. PENAL CODE ANN. § 38.05(a)(2) (Vernon Supp. 2008). The State argues that Salinas and Guevara conspired to hinder Guevara's apprehension.

The evidence shows that the day of Velia's murder, Guevara told the police in a written statement that he had lent Salinas his .22-caliber revolver. That night, he called and spoke with Salinas. That same night, around 10:30 p.m., Salinas called Timmerman. Around midnight, Timmerman returned Salinas's call. According to Timmerman's testimony at trial, Salinas instructed Timmerman to tell anyone who asked that Timmerman had borrowed her .22-caliber revolver. When Timmerman asked Salinas why she should say that, Salinas replied that "she [Salinas] had borrowed Jim's [Guevara] nine millimeter." The next day, Guevara gave a second written statement to the police wherein he stated that he had lent Salinas his .22-caliber revolver because Salinas had been "having a problem with her neighbors recently" and because "she had loaned her .25-caliber gun to her friend Tina [Timmerman]."

Although Guevara argues that Salinas's statements to Timmerman were intended to provide an alibi for herself [Salinas], we must review the trial court's decision under an abuse of discretion standard. And, looking at the evidence in a light most favorable to the trial court's determination, the evidence supports a different interpretation of the facts. According to Timmerman, Salinas told her that Guevara had given Salinas his nine-millimeter gun. Velia was killed with a nine-millimeter gun. Thus, Salinas's statement created an alibi *for Guevara*; it took a nine-millimeter gun out of Guevara's possession. It also gave credence to Guevara's written statement that he had lent Salinas

his gun. And, in creating an alibi for Guevara and in attempting to give credence to Guevara's written statement, Salinas tried to persuade her friend Timmerman to lie about the gun to *anyone who asked*. That is, Salinas was perpetrating a falsehood by encouraging Timmerman to give false information in the hopes of such information getting back to investigators. Thus, the question becomes whether a person who, with intent to hinder the arrest, prosecution, conviction, or punishment of another for an offense, perpetrates a falsehood by encouraging another person to give false information to a third party commits the offense of hindering apprehension.

Under former Penal Code article 77, an accessory was one "who, knowing that an offense has been committed, conceals the offender, or gives him any other aid in order that he may evade an arrest or trial or the execution of his sentence." *Easter v. State*, 536 S.W.2d 223, 227 n.5 (Tex. Crim. App. 1976). In 1974, the Penal Code abolished the distinction between a principal and an accomplice: It eliminated an accessory being a party to a crime and replaced an accessory with the current section 38.05, hindering apprehension or prosecution. *Id.* at 228. Both the former law and the current section 38.05 punish a person who conceals or aids another to avoid arrest or prosecution. Thus, in considering whether one who perpetrates a falsehood by encouraging another to provide false information commits the crime of hindering apprehension under section 38.05, we look to cases interpreting the former law.

Under the prior law, the Texas Court of Criminal Appeals explained that although the mere presence of a witness during the commission of a crime is insufficient to make the witness an accomplice, "it has been held that the giving of false information can be such an act as to render one an accessory." *Easter*, 536 S.W.2d at 226 (citing *Prine v. State*, 509 S.W.2d 617 (Tex. Crim. App. 1974), *Gottschalk v. State*, 157 Tex. Crim. 276, 248 S.W.2d 473 (1952), and *Littles v. State*, 111

Tex. Crim. 500, 14 S.W.2d 853 (1929)). The court noted that "this is so even if the person to whom the false information is given is not a peace officer if done for the purpose of aiding the principal to evade arrest or trial." *Id.* (citing *McGoodwin v. State*, 134 Tex. Cr. R. 231, 115 S.W.2d 634 (1938)). And, the court reasoned that "it is not essential that the aid rendered be of such character as will enable the offender to escape or to conceal himself. It is sufficient if the aid enables elusion of present arrest and prosecution." *Id.* (citations omitted). Thus, the court explained that "a wife who made a false statement to the owner concerning the whereabouts of a stolen calf, for the purpose of aiding her husband (a co-defendant) and the accused to evade arrest or trial, was an accomplice witness." *Id.* (citing *McGoodwin*, 115 S.W.2d at 635).

Here, based on the evidence, the trial court could have reasonably concluded that Salinas perpetrated a falsehood by encouraging Timmerman to provide false information for the purpose of aiding Guevara to evade arrest or prosecution. Under the former law, this evidence would be sufficient to make Salinas an accomplice witness. We conclude that it is also sufficient to make Salinas culpable under section 38.05. *See* TEX. PENAL CODE ANN. § 38.05(a)(2) (Vernon Supp. 2008) (stating that a person commits the offense of hindering apprehension or prosecution "if, with intent to hinder the arrest, prosecution, conviction, or punishment of another for an offense" she "provides or aids in providing the other with any means of avoiding arrest or effecting escape").

Now, we must consider whether Salinas's statements to Timmerman were in furtherance of the conspiracy to hinder Guevara's apprehension. Statements made in furtherance of a conspiracy include those made (1) with intent to induce another to deal with co-conspirators or in any other way to cooperate or assist co-conspirators; (2) with intent to induce another to join the conspiracy; (3) in formulating future strategies of concealment to benefit the conspiracy; (4) with intent to induce

continued involvement in the conspiracy; or (5) for the purpose of identifying the role of one conspirator to another. *King v. State*, 189 S.W.3d 347, 360 (Tex. App.—Fort Worth 2006, no pet.); *Lee v. State*, 21 S.W.3d 532, 538 (Tex. App.—Tyler 2000, pet. ref'd). In contrast, statements not made in furtherance of a conspiracy include those that are (1) casual admissions of culpability to someone the declarant had individually decided to trust; (2) mere narrative descriptions; (3) mere conversations between conspirators; or (4) "puffing" or "boasting" by co-conspirators. *King*, 189 S.W.3d at 360; *Lee*, 21 S.W.3d at 538. Thus, the issue here is "whether the objectives of the conspiracy to hinder [Guevara]'s apprehension had been attained when [Salinas] made the out-of-court statement." *Byrd*, 187 S.W.3d at 443 (citations omitted).

In deciding this issue, we must recognize the "vital distinction" "between acts of concealment done in furtherance of the *main* criminal objectives of the conspiracy, and acts of concealment done after these central objectives have been attained, for the purpose only of covering up after the crime." *Id.* (quoting *Grunewald v. United States*, 353 U.S. 391, 405 (1957)). In *Byrd v. State*, 187 S.W.3d at 442-43, the Texas Court of Criminal Appeals applied this analysis to two out-of-court statements made by a co-conspirator and held that one did not advance the objectives of the conspiracy while the other statement did. In *Byrd*, the appellant was convicted of murdering the victim by striking the victim in the head with a barbell. *Id.* at 437. The murder occurred in the apartment of appellant's brother. *Id.* The appellant's brother testified at trial that he saw appellant strike the victim with the barbell. *Id.* The girlfriend of the appellant's brother testified that she came out of a bedroom and saw appellant and her boyfriend standing near the bleeding victim lying on the floor. *Id.* Appellant, his brother, and his brother's girlfriend cleaned up the crime scene. *Id.* Later that same day, appellant's brother told his girlfriend that they could not tell anyone about the murder. *Id.* Appellant's brother

also said that he would take responsibility for the murder if anyone asked him about it. *Id.* Both these statements were admitted at trial without objection. *Id.* That is, the girlfriend of appellant's brother testified that on the day of the murder, appellant's brother had gone to sleep. *Id.* When he awoke, he said that "we couldn't tell nobody [sic]. That if anybody came to him to ask him about it or whatever, he was going to tell them that he was the one that [sic] did it." *Id.* The girlfriend also testified over defense objection that she and appellant's brother were discussing what had happened when appellant's brother asked "why did [the victim] just keep doing it and why did [appellant] have to hit him." *Id.* at 438.

The court of criminal appeals noted that the "conspiracy to hinder appellant's apprehension was still ongoing at the time of the conversation between" appellant's brother and his brother's girlfriend. *Id.* at 442-43. The court reasoned that appellant's brother's statement about taking responsibility for the murder and protecting his girlfriend advanced the objectives of this conspiracy. *Id.* at 443. However, the court decided that appellant's brother's other out-of-court statement, which rhetorically asked why appellant had to hit the victim, did not advance the objective of the conspiracy to hinder appellant's apprehension. *Id.*

Here, we must decide whether Salinas's out-of-court statements to Timmerman advanced the objective of the conspiracy to hinder Guevara's apprehension. We conclude that they did.

By telling Timmerman to lie about Timmerman borrowing Salinas's .22-caliber gun in order to give credence to Salinas having borrowed Guevara's nine-millimeter gun, Salinas did more than commit an "act of concealment" done after the main criminal objective of the conspiracy had been attained "for the purpose only of covering up after the crime." *Byrd*, 187 S.W.3d at 443. Indeed, Salinas's statements affirmatively advanced the conspiracy to hinder Guevara's apprehension. Her

statements took the murder weapon out of Guevara's possession and gave credence to Guevara's written statement to the police that he had lent his gun because Salinas had lent her own gun to Timmerman. Thus, we hold that Salinas's statements were made in furtherance of a conspiracy.

For the reasons stated above, Salinas's out-of-court statements were admissible under Texas Rule of Evidence 801(e)(2)(E). Thus, the trial court did not abuse its discretion in overruling Guevara's objection.

### CRAWFORD V. WASHINGTON

Guevara argues that the admission of Salinas's out-of-court statements to Timmerman violated his right to confrontation under the Sixth and Fourteenth Amendments to the United States Constitution. We disagree.

Before *Crawford v. Washington*, 541 U.S. 36 (2004), was decided, the scope of a defendant's Confrontation Clause rights was delineated by *Ohio v. Roberts*, 448 U.S. 56, 66 (1980), which conditioned the admissibility of all hearsay evidence on whether it fell under a "firmly rooted hearsay exception" or bore "particularized guarantees of trustworthiness." Under this test, a hearsay statement was *per se* reliable under the Confrontation Clause if it fell within a "firmly rooted" exception to the hearsay rule. *Guidry v. State*, 9 S.W.3d 133, 149 (Tex. Crim. App. 1999). *Crawford*, however, abrogated *Roberts*. Instead of focusing on whether a hearsay statement fell within a "firmly rooted" exception to the hearsay rule, *Crawford* focused on whether a hearsay statement was testimonial or nontestimonial. *See Crawford*, 541 U.S. at 68. Under *Crawford*, the admission of testimonial hearsay violates the Confrontation Clause unless the declarant is shown to be unavailable to testify and the defendant had a prior opportunity to cross-examine the declarant. *Id.* Thus, the threshold question here is whether Salinas's out-of-court statement to Timmerman was testimonial.

We review whether a statement is testimonial de novo. *Wall v. State*, 184 S.W.3d 730, 742 (Tex. Crim. App. 2006).

Although the Court in *Crawford* left "for another day any effort to spell out a comprehensive definition of 'testimonial,'" it stated that "[w]hatever else the term covers, it applies at a minimum to prior testimony at a preliminary hearing, before a grand jury, or at a former trial; and to police interrogations." *Crawford*, 541 U.S. at 68. Here, Salinas voluntarily gave the statement to Timmerman, a friend. It was not made in the context of a police investigation or interrogation or under circumstances that would have led an objective witness to believe that the statement would be available for use at a later trial. Thus, we hold that the statement was nontestimonial and that Guevara's right to confrontation was not violated. *See id.*; *Wall*, 184 S.W.3d at 735.

## JURY INSTRUCTION

In his final issue, Guevara argues that in the jury charge, the trial court should have provided the jury with a more detailed description of the law of parties, taking into account the particular facts of the case.

"In reviewing charge error, we first determine whether error exists." *Druery v. State*, 225 S.W.3d 491, 504 (Tex. Crim. App. 2007); *see also Almanza v. State*, 686 S.W.2d 157, 174 (Tex. Crim. App. 1985) (opinion on reh'g). "If we find error, we must then determine whether the error caused sufficient harm to require reversal." *Druery*, 225 S.W.3d at 504. Preservation of charge error does not become an issue until we assess harm. *Middleton v. State*, 125 S.W.3d 450, 453 (Tex. Crim. App. 2003). The degree of harm necessary for reversal depends on whether the appellant preserved the error. *Id.* (quoting *Hutch v. State*, 922 S.W.2d 166, 171 (Tex. Crim. App. 1996)); *see Almanza*, 686 S.W.2d at 171. Thus, we review alleged charge error by considering (1) whether error existed

in the charge; and (2) whether sufficient harm resulted from the error to compel reversal. *See Posey v. State*, 966 S.W.2d 57, 60 & n.5 (Tex. Crim. App. 1998).

A person is criminally responsible as a party to the offense pursuant to section 7.01 of the Penal Code if he commits an offense "by his own conduct, by the conduct of another for which he is criminally responsible, or by both." TEX. PENAL CODE ANN. § 7.01(a) (Vernon 2003). And, pursuant to section 7.01, "[e]ach party to an offense may be charged with commission of the offense." *Id.* § 7.01(b). Section 7.01 also abolished "[a]ll traditional distinctions between accomplices and principals," providing instead that "each party to an offense may be charged and convicted without alleging that he acted as a principal or accomplice." *Id*. § 7.01(c).

Pursuant to section 7.02, "[a] person is criminally responsible for an offense committed by the conduct of another if . . . (2) acting with intent to promote or assist the commission of the offense, he solicits, encourages, directs, aids, or attempts to aid the other person to commit the offense . . . ." *Id.* § 7.02(a)(2).

The trial court must give "a written charge distinctly setting forth the law applicable to the case." TEX. CODE CRIM. PROC. ANN. art. 36.14 (Vernon 2007). Guevara argues that the trial court should have submitted his requested instruction to the jury. However, a trial court may refuse to give requested instructions where the instructions given by the court are adequate and fully protect the rights of the accused. *Tovar v. State,* 165 S.W.3d 785, 792 (Tex. App.—San Antonio 2005, no pet.). Here, the jury charge instructed the following:

> Our law provides a person is criminally responsible as a party to an offense if the offense is committed by his own conduct, or by the conduct of another for which he is criminally responsible, or by both. Each party to an offense may be charged with commission of the offense.

> Mere presence alone will not make a person party to an offense. A person is criminally responsible for an offense committed by the conduct of another if acting with intent to promote or assist the commission of the offense he solicits, encourages, directs, aids or attempts to aid the other person to commit the offense.

And, the application paragraph of the jury charge stated the following:

> Now, if you find from the evidence beyond a reasonable doubt that on or about the 26th day of May, A.D., 1993, in Bexar County, Texas, Minnie Salinas AKA Bronte Guevara did intentionally or knowingly cause the death of an individual, Velia Guevara, by shooting Velia Guevara with a firearm; or if you find from the evidence beyond a reasonable doubt that on or about the 26th day of May, A.D., 1993, in Bexar County, Texas, Minnie Salinas AKA Bronte Guevara, acting with intent to cause serious bodily injury to Velia Guevara did then and there commit an act clearly dangerous to human life, to wit: by shooting at or in the direction of Velia Guevara with a firearm, thereby causing the death of Velia Guevara; and you further find that the defendant, James Guevara, acted with the intent to promote or assist the commission of the offense by Minnie Salinas AKA Bronte Guevara by encouraging, directing, aiding, or attempting to aid her to commit the offense of causing the death of Velia Guevara, then you will find the defendant guilty of murder as charged in the indictment. If you do not so find beyond a reasonable doubt, or if you have a reasonable doubt thereof, you will find the defendant not guilty.

Guevara argues that a more specific instruction was necessary because it was undisputed that he was not present at the time of the crime and therefore, "the jury needed to determine whether Guevara had prior knowledge of Salinas's plan to kill Velia, participated in that plan, and was assisting Salinas at the time of the commission of the offense." Thus, Guevara argues that the trial court should have given his requested instruction to the jury:

> In order to establish liability as a party, in addition to the illegal conduct of the primary actor, it must be shown that the accused harbored the specific intent to promote or assist the commission of the offense.

> The accused must know that he was assisting in the offense's commission, and an agreement, if any, must be before or contemporaneous with the criminal intent.

> What the evidence must show is that, at the time of the commission of the offense, the parties were acting together, each doing some part of the execution of the common design.

-25-

A person's acts committed after the offense is completed cannot make him a party to the offense.

In support of his argument, Guevara points to language in *Pesina v. State*, 949 S.W.2d 374, 382 (Tex. App.—San Antonio 1997, no pet.), that a party must have specific intent to promote or assist in the commission of the offense and that specific intent must exist at the time of the commission of the offense. Guevara argues that the jury should have been instructed about such specific intent and about having such intent at the time of the commission of the offense. We, however, conclude that the jury was so instructed.

The jury charge adequately instructed the jury. The charge instructed the jury that it must find Guevera "*acted with the intent to promote or assist the commission of the offense by Minnie Salinas AKA Bronte Guevara by encouraging, directing, aiding, or attempting to aid her to commit the offense of causing the death of Velia Guevara*." (emphasis added). Thus, the jury was instructed that Guevara had to act with the specific intent to promote or assist the commission of Velia's murder by Salinas. And, the charge adequately instructed the jury that such intent must exist at the time the murder was committed. That is, one cannot act with the intent to promote or assist the commission of a murder if the murder had already happened. Necessarily, one can only act with intent to promote or assist the commission of a murder if the victim had yet to be killed. Further, the charge tracked the language of the relevant statutes. *See Tovar*, 165 S.W.3d at 792 (explaining that because the language in the jury charge tracked the language of the relevant statutes, it adequately and fully protected the appellant's rights). Therefore, we hold that the charge adequately and fully protected Guevara's rights and that the trial court did not err in refusing Guevara's requested instruction.

## CONCLUSION

We affirm the trial court's judgment.


Karen Angelini, Justice



PUBLISH