# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-13-00301-CR

**Linda Sue Cowan, Appellant**

**v.**

**The State of Texas, Appellee**

### FROM THE DISTRICT COURT OF BURNET COUNTY, 33RD JUDICIAL DISTRICT
### NO. 38985, HONORABLE DANIEL H. MILLS, JUDGE PRESIDING

## M E M O R A N D U M   O P I N I O N

A jury convicted appellant Linda Sue Cowan of the offense of aggravated assault with a deadly weapon.[1] The district court rendered judgment on the jury's verdict and sentenced Cowan to fifteen years' imprisonment. In four issues on appeal, Cowan asserts that: (1) the district court abused its discretion in admitting evidence that Cowan contends was hearsay; (2) the district court made improper comments regarding the weight of the evidence; (3) the district court abused its discretion in admitting into evidence the weapon that was allegedly used during the commission of the offense; and (4) the testimony of an accomplice witness was not sufficiently corroborated. We will affirm the judgment of conviction.

---

[1] *See* Tex. Penal Code § 22.02(a)(2).

# BACKGROUND

Cowan was charged with causing bodily injury to the victim, Christie Jackson, by shooting her with a firearm. During trial, the jury heard evidence that in the early morning hours of December 18, 2009, Jackson was shot in her bed by someone standing outside her window with a rifle. The shooter, according to the evidence presented, was Cowan's adult son, Vincent.[2] The State's theory at trial was that Cowan—out of hatred of Jackson stemming, in part, from Jackson's relationship with Cowan's ex-boyfriend, Rudy Quintero—had instructed her son to shoot Jackson in order to eliminate her from Quintero's life. Evidence considered by the jury, which we discuss in more detail below as it is relevant to Cowan's issues on appeal, included the testimony of Cowan's step-brother, Thomas Pearson, who claimed to have participated in the shooting as a "lookout"; Quintero, who testified that Cowan owned a .22 caliber rifle and that Cowan and Jackson "didn't get along"; and Cowan, who testified in her defense and denied any involvement in the shooting. Vincent did not testify, although statements that he had allegedly made to Pearson concerning the crime were admitted into evidence under the co-conspirator exception to the hearsay rule.[3] Also admitted into evidence was a rifle that was allegedly used by Vincent to shoot Jackson, which had been recovered near a lake approximately one year after the shooting occurred.

The jury found Cowan guilty as charged and assessed punishment as noted above. The district court rendered judgment on the jury's verdict and subsequently denied Cowan's motion for new trial. This appeal followed.

---

[2] We use Vincent's first name to distinguish him from his mother.

[3] *See* Tex. R. Evid. 801(e)(2)(E).

**ANALYSIS**

**Accomplice testimony**

We first address Cowan's fourth issue, in which she asserts that the testimony of the State's accomplice witness, Thomas Pearson, was not sufficiently corroborated.[4] Pearson testified that Cowan had instructed him and Vincent that she wanted them to "deal with" the victim, which, according to Pearson, meant "[k]illing her." When asked to describe how Cowan had wanted Jackson to be killed, Pearson testified:

> At first it was a propane tank, sticking a hose from a propane tank and when the—she knew that [Jackson] smoked cigarettes and whenever she would light a lighter it would explode. And then she wanted her son, Vincent, to put a tank underneath where her house is and turn the gas on and then take the rifle from a distance and shoot at it so it would hit the fuse in midair and blow up the house.

Pearson further testified that Cowan had purchased propane tanks for the purpose of blowing up Jackson's house but eventually decided that Jackson should simply be shot. Pearson claimed that Cowan had instructed Vincent "to walk up to [Jackson's] window" and shoot her with Cowan's gun, which Pearson testified was a ".22 bolt action" rifle. Pearson claimed that Vincent eventually agreed to shoot Jackson, and he agreed to help. On the night of the shooting, Pearson recalled, he had accompanied Vincent to Jackson's house, acted as a "lookout" when Vincent proceeded to shoot the rifle through the victim's window, and helped dispose of the rifle following the shooting. According

---

[4] The State does not dispute that Pearson was an accomplice witness, and the record supports a finding that he was. *See Druery v. State*, 225 S.W.3d 491, 498 (Tex. Crim. App. 2007). It is also undisputed that Pearson's testimony was the primary evidence implicating Cowan in the shooting.

to Pearson, several days after the shooting, he and Cowan drove to Inks Lake State Park and threw the rifle into an extension of the lake known as the "Devil's Waterhole."

"Texas law requires that, before a conviction may rest upon an accomplice witness's testimony, that testimony must be corroborated by independent evidence tending to connect the accused with the crime."[5] "This accomplice witness rule creates a statutorily imposed review and is not derived from federal or state constitutional principles that define the legal and factual sufficiency standards."[6] Instead, the rule "reflects 'a legislative determination that accomplice testimony implicating another person should be viewed with a measure of caution, because accomplices often have incentives to lie, such as to avoid punishment or shift blame to another person.'"[7]

"When evaluating the sufficiency of corroboration evidence under the accomplice-witness rule, we 'eliminate the accomplice testimony from consideration and then examine the remaining portions of the record to see if there is any evidence that tends to connect the accused with the commission of the crime.'"[8] "To meet the requirements of the rule, the corroborating evidence need not prove the defendant's guilt beyond a reasonable doubt by itself."[9]

---

[5] *Id*. (citing Tex. Code Crim. Proc. art. 38.14).

[6] *Id*. (citing *Cathey v. State*, 992 S.W.2d 460, 462-63 (Tex. Crim. App. 1999)).

[7] *Zamora v. State*, 411 S.W.3d 504, 509 (Tex. Crim. App. 2013) (quoting *Blake v. State*, 971 S.W.2d 451, 454 (Tex. Crim. App. 1998)).

[8] *Malone v. State*, 253 S.W.3d 253, 257 (Tex. Crim. App. 2008) (quoting *Solomon v. State*, 49 S.W.3d 356, 361 (Tex. Crim. App. 2001)).

[9] *Id*. (citing *Trevino v. State*, 991 S.W.2d 849, 851 (Tex. Crim. App. 1999); *Gill v. State*, 873 S.W.2d 45, 48 (Tex. Crim. App. 1994)).

"Rather, the evidence must simply link the accused in some way to the commission of the crime and show that 'rational jurors could conclude that this evidence sufficiently tended to connect [the accused] to the offense.'"[10] "There is no set amount of non-accomplice corroboration evidence that is required for sufficiency purposes; '[e]ach case must be judged on its own facts.'"[11] "All facts, both direct and circumstantial, may be examined in ascertaining whether sufficient corroboration exists."[12] "Motive and opportunity evidence is insufficient on its own to corroborate accomplice-witness testimony, but both may be considered in connection with other evidence that tends to connect the accused to the crime."[13] The corroborating evidence must be viewed in the light most favorable to the jury's verdict.[14] "So when there are conflicting views of the evidence—one that tends to connect the accused to the offense and one that does not—we will defer to the factfinder's resolution of the evidence."[15]

In this case, there is evidence independent of Pearson's testimony that, a rational jury could have reasonably found, sufficiently "tended to connect" Cowan to the offense. Cowan's ex-boyfriend, Rudy Quintero, testified that in 2009, the same year as the shooting, Cowan had owned

[10] *Id*. (quoting *Hernandez v. State*, 939 S.W.2d 173, 179 (Tex. Crim. App. 1997)).

[11] *Id*. (quoting *Gill*, 873 S.W.2d at 48).

[12] *Gosch v. State*, 829 S.W.2d 775, 777 (Tex. Crim. App. 1991).

[13] *Smith v. State*, 332 S.W.3d 425, 442 (Tex. Crim. App. 2011).

[14] *Brown v. State*, 270 S.W.3d 564, 567 (Tex. Crim. App. 2008) (citing *Gill*, 873 S.W.2d at 48); *Hernandez v. State*, 454 S.W.3d 643, 647 (Tex. App.—Houston [1st Dist.] 2014, no pet.).

[15] *Smith*, 332 S.W.3d at 442 (citing *Simmons v. State*, 282 S.W.3d 504, 508 (Tex. Crim. App. 2009)).

a .22-caliber rifle, which was the same caliber of rifle that, according to the evidence presented, had been used in the shooting. Quintero further testified that Cowan and Jackson "didn't get along" and that the first thing that came to his mind when he heard about the shooting was whether Cowan was somehow responsible for it. Cowan, during her testimony, acknowledged that she had told the police that she and Jackson "had a couple of confrontations" prior to the shooting. Additionally, Deputy Tracey Hallman of the Burnet County Sheriff's Department, who had investigated the shooting, testified that Cowan had called the sheriff's department on the day of the shooting and claimed that both she and Jackson had received "threatening phone calls" from an unknown individual and that this individual had threatened to kill both Cowan and Jackson. Hallman returned Cowan's phone call and, during the call, asked Cowan if she knew where her son was. According to Hallman, Cowan told her that she was not aware of Vincent's whereabouts, "appeared to get defensive" when Hallman continued to question her about her son, and later appeared upset when Cowan learned that Vincent had been located and was being questioned by police. Hallman testified that when she interviewed Cowan at the sheriff's department, Cowan admitted that she had been dating Rudy Quintero, that she knew where Christie Jackson lived, and that she had previously owned a .22 caliber rifle.[16] Additionally, Allen Lucas, who knew both Cowan and Vincent, testified that, at some point after the shooting, Cowan had told him "something about [Cowan] getting rid of Vincent's clothing [that] he was wearing the night of the shooting." Lucas further testified that

---

[16] According to the evidence presented, the rifle that Cowan had previously owned was stolen from her in 2008, later recovered from a pawn shop, and excluded by forensic testing as the rifle that had been used in the shooting. Nevertheless, Cowan's ownership of a .22 caliber rifle in 2008 would support an inference by the jury that Cowan had owned another .22 caliber rifle in 2009, around the time of the shooting, as Quintero had claimed in his testimony.

Cowan had later asked him to testify falsely in court concerning the shooting. Specifically, Lucas recounted, Cowan had asked him to testify that he had met someone at a bar who claimed that Jackson had arranged the shooting herself and had paid this unidentified person to shoot her. Pearson's wife, Amanda, similarly testified that Cowan had asked her to call the Burnet County Sheriff's Department and report that she had overheard someone at a bar claiming responsibility for the shooting. Additionally, Amanda testified that at some point following the shooting, she had overheard an argument between Pearson and Cowan in which "[Pearson] said something to [Cowan] along the lines of that, you know, he only had to make a phone call to get her in trouble and [Cowan] had replied that he was involved too so he would get in trouble as well." Viewing the combined force of the above evidence and all reasonable inferences therefrom in the light most favorable to the jury's verdict, we conclude that a rational jury could find that it sufficiently "tended to connect" Cowan to the offense so as to corroborate Pearson's testimony.[17] We overrule Cowan's fourth issue.

**Hearsay**

We next address Cowan's first issue, in which she asserts that the district court abused its discretion by allowing Pearson to testify to the following statements allegedly made by Vincent Cowan that she claims are hearsay: (1) Vincent stating, "I'll do it" when Cowan asked him to shoot Jackson; (2) Vincent stating, "I got to do it," when Pearson subsequently attempted to dissuade Vincent from shooting Jackson; (3) Vincent asking Pearson "to be kind of like a lookout"

---

[17] *See Smith*, 332 S.W.3d at 442-43 (explaining that it is improper for reviewing court to take a "divide and conquer approach" when evaluating sufficiency of corroborating evidence and that court should instead "consider the combined force of all of the non-accomplice evidence that tends to connect the accused to the offense").

during the shooting; (4) Vincent advising Pearson that he would approach Jackson's window in order to shoot her; (5) Vincent informing Pearson where Jackson lived;[18] and (6) Vincent stating to Pearson, after he had shot Jackson, "We got to go," and, "I can't believe I did it, I did it, I shot her, I shot her." The district court, in overruling Cowan's objections to these statements, cited to the co-conspirator exception to the hearsay rule.[19]

We review a trial court's ruling on the admission or exclusion of evidence for an abuse of discretion.[20] A trial court abuses its discretion only when its decision "is so clearly wrong as to lie outside that zone within which reasonable persons might disagree."[21] We consider the ruling in light of what was before the trial court at the time the ruling was made and uphold the court's decision if it lies within the zone of reasonable disagreement.[22] If the trial court's evidentiary ruling is reasonably supported by the record and correct on any theory of law applicable to that ruling, we will uphold the decision.[23]

---

[18] Although Pearson did not explicitly identify who had told him where Jackson lived, it is apparent from the context of the surrounding testimony that Pearson was referring to Vincent, and Cowan does not contend otherwise.

[19] *See* Tex. R. Evid. 801(e)(2)(E).

[20] *Tillman v. State*, 354 S.W.3d 425, 435 (Tex. Crim. App. 2011); *Sandoval v. State*, 409 S.W.3d 259, 281 (Tex. App.—Austin 2013, no pet.).

[21] *McDonald v. State*, 179 S.W.3d 571, 576 (Tex. Crim. App. 2005) (citing *Montgomery v. State*, 810 S.W.2d 372, 391 (Tex. Crim. App. 1991) (op. on reh'g)).

[22] *Billodeau v. State*, 277 S.W.3d 34, 39 (Tex. Crim. App. 2009); *Sandoval*, 409 S.W.3d at 281.

[23] *De La Paz v. State*, 279 S.W.3d 336, 344 (Tex. Crim. App. 2009); *Carrasco v. State*, 154 S.W.3d 127, 129 (Tex. Crim. App. 2005); *Sandoval*, 409 S.W.3d at 297.

Hearsay is an out-of-court statement "offered in evidence to prove the truth of the matter asserted."[24] However, an out-of-court statement is not hearsay if it is offered against an opposing party and "was made by the party's co-conspirator during and in furtherance of the conspiracy."[25] "The co-conspirator exemption from the hearsay rule is based on agency principles, 'the underlying concept being that a conspiracy is a common undertaking where the conspirators are all agents of each other and where the acts and statements of one can be attributed to all.'"[26] "In order to satisfy this exception, the State must show that a conspiracy existed in which the co-conspirator was a member of or later participated in the conspiracy, and that the statements made were the object and purpose of the conspiracy."[27] Additionally, the statement must be made both "during" and "in furtherance of" the conspiracy, which means that the statement was "made in an effort to 'advance the cause of the conspiracy' or 'serve . . . to facilitate the conspiracy.'"[28] If a statement merely "reports the status of the conspiracy" to another or describes "what was occurring or what had occurred," the statement is not admissible under Rule 801(e)(2)(E).[29] "Statements made in furtherance of a conspiracy include those made (1) with intent to induce another to deal with

---

[24] Tex. R. Evid. 801(d).

[25] *Id*. R. 801(e)(2).

[26] *Byrd v. State*, 187 S.W.3d 436, 440 (Tex. Crim. App. 2005) (quoting *Bourjaily v. United States*, 483 U.S. 171, 188-94 (1987) (Blackmun, J., dissenting)).

[27] *Guidry v. State*, 9 S.W.3d 133, 148 (Tex. Crim. App. 1999) (citing *Ward v. State*, 657 S.W.2d 133, 136-37 (Tex. Crim. App. 1983)).

[28] *Id*. (quoting *Deeb v. State*, 815 S.W.2d 692, 697 (Tex. Crim. App. 1991)); *Guevara v. State*, 297 S.W.3d 350, 361 (Tex. App.—San Antonio 2009, pet. ref'd).

[29] *Guidry*, 9 S.W.3d at 148.

co-conspirators or in any other way to cooperate or assist co-conspirators; (2) with intent to induce another to join the conspiracy; (3) in formulating future strategies of concealment to benefit the conspiracy; (4) with intent to induce continued involvement in the conspiracy; or (5) for the purpose of identifying the role of one conspirator to another."[30] "In contrast, statements not made in furtherance of a conspiracy include those that are (1) casual admissions of culpability to someone the declarant had individually decided to trust; (2) mere narrative descriptions; (3) mere conversations between conspirators; or (4) 'puffing' or 'boasting' by co-conspirators."[31]

In this case, Pearson's testimony claiming that Cowan had asked Vincent to shoot Jackson, that Vincent had agreed, and that Pearson had agreed to help, along with the other evidence summarized above, supports a finding by the district court that Cowan, Vincent, and Pearson had entered into an agreement to shoot Jackson. Thus, the district court would not have abused its discretion in finding that the first requirement for admissibility under Rule 801(e)(2)(E) was satisfied—that a conspiracy existed and that Vincent was a member of that conspiracy. In contending otherwise, Cowan places significance on the fact that the State failed to allege that she had committed a conspiracy offense and, during the charge conference, argued against including a conspiracy instruction in the jury charge. However, Rule 801(e)(2)(E) does not require that a

---

[30] *Guevara*, 297 S.W.3d at 363 (citing *King v. State*, 189 S.W.3d 347, 360 (Tex. App.—Fort Worth 2006, no pet.); *Lee v. State*, 21 S.W.3d 532, 538 (Tex. App.—Tyler 2000, pet. ref'd)).

[31] *Id*.

conspiracy be charged, only that one can be shown to have existed.[32] The record here supports a finding that a conspiracy existed, even though Cowan was not charged with a conspiracy offense.[33]

The record also supports a finding that five of the six challenged statements were made "during" and "in furtherance of" the conspiracy. It would not be outside the zone of reasonable disagreement for the district court to find that: (1) Vincent's first statement, "I'll do it," had consummated the agreement between the parties and thus was essential to the conspiracy moving forward; (2) Vincent's second statement, "I got to do it," which was made while Pearson and Vincent were en route to Jackson's residence, furthered the conspiracy by encouraging Pearson to continue with the shooting, despite his attempt to persuade Vincent to abort the plan; and (3) Vincent's third, fourth, and fifth statements—asking Pearson "to be kind of like a lookout" during the shooting, advising Pearson that he would approach Jackson's window in order to shoot her, and informing Pearson where Jackson lived—furthered the conspiracy by instructing Pearson how and where the crime was to be committed and explaining what their respective roles would be.

Vincent's sixth statement, in which he told Pearson that they "got to go" and admitted to having shot Jackson, is a closer call. At the time this statement was made, the main objective of the conspiracy—shooting Jackson—had, according to Pearson, been completed. Thus, it is questionable whether the record supports a finding by the district court that such a statement was

---

[32] *See Byrd*, 187 S.W.3d at 440 & n.8; *Meador v. State*, 812 S.W.2d 330, 332 (Tex. Crim. App. 1991).

[33] *See* Tex. Penal Code § 15.02(a) (defining "conspiracy" as agreement between two or more persons, "with intent that a felony be committed," that "they or one or more of them engage in conduct that would constitute the offense"), (b) ("An agreement constituting a conspiracy may be inferred from acts of the parties.").

11

made "during" and "in furtherance of" the conspiracy.[34] Nevertheless, even if this statement should not have been admitted under Rule 801(e)(2)(E), we are to uphold the district court's ruling if it is correct under any theory of law applicable to the ruling.[35] Here, it would not be outside the zone of reasonable disagreement for the district court to find that Vincent's statement—which was made immediately after the shooting had occurred and, the district court could have reasonably found, while Vincent appeared to be under the stress of the shooting—was admissible as an excited utterance.[36] On this record, we cannot conclude that the district court abused its discretion in admitting the challenged statements.[37] We overrule Cowan's first issue.

---

[34] There is some support in the record for a finding by the district court that the conspiracy encompassed not only the shooting itself, but also subsequent efforts to conceal the conspirators' involvement in the crime. Pearson had earlier testified that Cowan had provided instructions to Vincent and Pearson concerning what to do after they had shot Jackson, which included driving away from Jackson's residence in a certain direction, throwing the rifle off of a bridge in Llano, and being seen on a security camera at a Wal-Mart in Marble Falls. Thus, the district court could have found that Vincent's statement to Pearson that they "got to go" and acknowledging that he had succeeded in shooting Jackson furthered the conspiracy by signaling to Pearson that it was time to proceed to the concealment phase of the conspiracy. However, the Court of Criminal Appeals has cautioned that there is a "vital distinction" between statements made "in furtherance of the main criminal objectives of the conspiracy" and statements made "after these central objectives have been attained, for the purpose only of covering up after the crime." *Byrd*, 187 S.W.3d at 442 (citing *Grunewald v. United States*, 353 U.S. 391, 405 (1957)). Statements made after the criminal objective has been completed are less likely to qualify as co-conspirator statements. *See id*.

[35] *See De La Paz*, 279 S.W.3d at 344.

[36] *See* Tex. R. Evid. 803(2) (defining "excited utterance" as "[a] statement relating to a startling event or condition, made while the declarant was under the stress of excitement that it caused").

[37] *See, e.g.*, *Orona v. State*, 341 S.W.3d 452, 464-65 (Tex. App.—Fort Worth 2011, pet. ref'd); *Guevara*, 297 S.W.3d at 364; *Arroyo v. State*, 239 S.W.3d 282, 292-93 (Tex. App.—Tyler 2007, pet. ref'd).

**Comments by the district court**

In her second issue, Cowan asserts that the district court improperly commented on the weight of the evidence when the court, following an objection by the State to Cowan's questioning of a witness, attempted to explain to defense counsel, in the presence of the jury, why it was sustaining the State's objection and why it believed Cowan's line of questioning to be improper.[38] Cowan did not object to the district court's comments at the time they were made. Accordingly, Cowan failed to preserve error, if any, in the court below.[39] We overrule Cowan's second issue.

**Admissibility of the rifle**

Finally, we address Cowan's third issue, in which she asserts that the district court abused its discretion in admitting the rifle into evidence without first establishing a proper chain of custody connecting the rifle that was used in the shooting to the rifle that was admitted in court as State's Exhibit 37. According to Cowan, the rifle should not have been admitted because it was not recovered from the lake until approximately one year after the shooting had occurred, it was not operational upon recovery, and its connection to the crime was established only through Pearson, whose testimony was unreliable, according to Cowan, because of his status as an accomplice witness.

---

[38] *See* Tex. Code Crim. Proc. art. 38.05 (providing that trial court shall not, "at any stage of the proceeding previous to the return of the verdict, make any remark calculated to convey to the jury his opinion of the case").

[39] *See* Tex. R. App. P. 33.1(a); *Unkart v. State*, 400 S.W.3d 94, 98-102 (Tex. Crim. App. 2013).

Cowan's arguments conflate the weight of the evidence with its admissibility. Absent evidence of tampering, which was not alleged here, "issues regarding the chain of custody bear on the weight, rather than on the admissibility, of evidence."[40] For an item of physical evidence to be admissible, "the proponent must produce evidence sufficient to support a finding that the item is what the proponent claims it is."[41] This can be proven in a number of different ways, including the testimony of a witness with knowledge "that an item is what it is claimed to be"[42] and "[t]he appearance, contents, substance, internal patterns, or other distinctive characteristics of the item, taken together with all the circumstances."[43] We review the district court's decision regarding the admissibility of physical evidence for abuse of discretion.[44] The district court does not abuse its discretion in admitting physical evidence if the record supports a finding that the evidence is what its proponent claims it to be.[45] We are to affirm the district court's decision so long as its ruling is "within the zone of reasonable disagreement."[46]

Here, the State claimed that the rifle offered into evidence, State's Exhibit 37, was the same rifle that was used in the shooting. To support this contention, the State offered the testimony

---

[40] *Davis v. State*, 313 S.W.3d 317, 348 (Tex. Crim. App. 2010) (citing *Lagrone v. State*, 942 S.W.2d 602, 617 (Tex. Crim. App. 1997)).

[41] Tex. R. Evid. 901(a).

[42] *Id*. R. 901(b)(1).

[43] *Id*. R. 901(b)(4).

[44] *Druery*, 225 S.W.3d at 502.

[45] *See id*.

[46] *Id*.

of Pearson and other witnesses who had handled the firearm. Pearson testified that the gun used in the shooting was a ".22 bolt action rifle" owned by Cowan. Pearson claimed that, after he had learned of Cowan's desire to use the rifle to kill Jackson, he had unsuccessfully "tried to get rid of it," "tried to sell it to a friend," and "tried to hide it under the house" where he and Cowan had lived at the time. Pearson also testified that his efforts to dispose of the rifle prior to the shooting were unsuccessful and that Vincent "had the rifle with him" when they went to Jackson's residence. During his testimony, Pearson was shown State's Exhibit 37 and was asked, "Have you ever seen that rifle before?" Pearson testified, "Yes, that's the rifle I tried to sell. And that's the rifle that was used [in the shooting]." Later, the State elicited the following testimony from Pearson tending to identify a distinctive characteristic of the rifle:

> Q. State's Exhibit 37, this rifle, did you ever—did you think that there was anything wrong with the barrel of this rifle?
>
> A. Yes, the barrel was slightly bent.
>
> Q. Okay. And are you sure that this is the same rifle?
>
> A. Yes, sir.

Pearson further testified that, shortly after committing the crime, Vincent had thrown the rifle into a neighbor's yard but that, several days later, Pearson and Cowan had entered the neighbor's yard, recovered the rifle, and transported it to the Devil's Waterhole to dispose of it. Pearson testified that he personally "went down [to the waterhole] and threw it in the lake."

The State also presented evidence tending to show how the rifle came into police custody. Thomas Simerly, who professed to be a frequent visitor to the lake, testified that in

15

January 2011, he was walking across a muddy area at the Devil's Waterhole when he observed a rifle in the mud. Simerly took possession of the rifle and informed the park ranger's office of what he had found. Simerly identified State's Exhibit 37 as the rifle he had recovered from the lake. Officer Eric Carlton of the park ranger's office testified that he took custody of the rifle and turned it over to officers at the Burnet County Sheriff's Department. Carlton identified State's Exhibit 37 as the rifle that had been given to him by Simerly. Deputy Denton Wills of the Burnet County Sheriff's Department testified that he took custody of the rifle from Carlton, "secured it in [his] vehicle," "transported it to the Burnet County Sheriff's office," and "secured it" in the crime lab. Wills identified State's Exhibit 37 as the rifle that he had obtained from Carlton. Deputy Dennis Forsgren, also of the Burnet County Sheriff's Department, testified that he transported the rifle from the Sheriff's Department to the Texas Department of Public Safety laboratory in Austin for testing, and he identified State's Exhibit 37 as that rifle. According to Forsgren, the rifle was sealed in a box at the time it was transported to the lab, and no changes, additions, or modifications were made to the rifle during transport. Finally, Nathan Tunnell, a firearm and toolmarks examiner for the Texas Department of Public Safety, identified State's Exhibit 37 as the rifle that had been submitted to the laboratory for testing to determine if it was the firearm that had fired a bullet that had been recovered from the crime scene. According to Tunnell, the rifle was not operational when it was received by the lab, and, although DPS was able to return the rifle to an operational state, they were unable to determine whether "the submitted bullet had been fired from this firearm" due to the water damage that the rifle had sustained.

On this record, we cannot conclude that the district court's decision to admit the rifle into evidence was outside the zone of reasonable disagreement. The district court could have reasonably found that Pearson had personally handled and observed the rifle on multiple occasions and thus was sufficiently familiar with it so that he could identify the rifle in court as the same rifle that was used in the shooting, which he did by noting a distinctive characteristic that the rifle possessed (its "slightly bent" barrel). The district court also could have reasonably found that the rifle was recovered in the same general location where Pearson claimed to have disposed of it, that it was immediately turned over to law-enforcement authorities, that the law-enforcement officers who had possessed the rifle identified State's Exhibit 37 as the same rifle that they had handled, that State's Exhibit 37 was the same rifle that Pearson had identified, and that the officers had securely handled and transported the rifle from one location to the next. This evidence, considered in its totality, supports a finding by the district court that the rifle was what the State claimed it to be.[47] Evidence tending to show that the rifle was not recovered until approximately one year after the shooting, that the rifle was not operational upon recovery, and that it was connected to the crime through the testimony of an accomplice witness, does not compel a contrary finding that the evidence was inadmissible. Rather, the district court could have reasonably found that these were matters for the jury to consider when evaluating the weight of the evidence and the strength of the State's claim regarding the rifle's identity.[48] We overrule Cowan's third issue.

---

[47] *See, e.g.*, *Druery*, 225 S.W.3d at 502-04; *Foster v. State*, 779 S.W.2d 845, 860-61 (Tex. Crim. App. 1989); *Hartsfield v. State*, 200 S.W.3d 813, 818-19 (Tex. App.—Texarkana 2006, pet. ref'd); *Martinez v. State*, 186 S.W.3d 59, 62 (Tex. App.—Houston [1st Dist.] 2005, pet. ref'd); *Ennis v. State*, 71 S.W.3d 804, 808-09 (Tex. App.—Texarkana 2002, no pet.).

[48] *See Davis*, 313 S.W.3d at 348; *Lagrone*, 942 S.W.2d at 617.

17

## CONCLUSION

We affirm the judgment of the district court.

_____

Bob Pemberton, Justice

Before Justices Pemberton, Field, and Bourland

Affirmed

Filed:   July 9, 2015

Do Not Publish